[No. 30519-4-II.   Division Two.   January 25, 2005.]

THE STATE OF WASHINGTON, *Respondent*, v. SOPHIA S. JOHNSON, *Appellant*.

---

*David Schultz*, for appellant.

*Arthur D. Curtis, Prosecuting Attorney*, and *Thomas C. Duffy, Deputy*, for respondent.

¶1 BRIDGEWATER, J. — Sophia S. Johnson appeals her conviction of first degree felony murder for the death of her mother-in-law, Marlyne Johnson. We hold that the trial court improperly removed a juror from the jury and that the bailiff had improper ex parte communications with the jury during deliberations. Because the issue of interception and recording communications under RCW 9.73.090 and .130 may arise in a new trial, we address it and hold that the record supported the court's determination that the order authorizing the interception and recording of Johnson's conversation was sufficient. We do not address the other evidentiary or instructional issues raised because we reverse and remand for a new trial.

¶2 On the afternoon of January 10, 2002, the body of Marlyne Johnson was discovered in the basement of her home by her son, Brad Johnson, and her daughter-in-law, Sophia Johnson. Mrs. Johnson had been severely beaten in

both the head and body with a set of fireplace tongs. Her watch had stopped running at 12:43 P.M. At trial, Dennis Wickham, a forensic pathologist, testified that the cause of Mrs. Johnson's death was the accumulation of multiple blows to the face.

¶3 During the police investigation of Mrs. Johnson's death, Suzie Parker spoke with Detective James Buckner of the Clark County Sheriff's Department. Ms. Parker was the fiancée of Johnson's brother, Sean Correia. At trial, Detective Buckner testified that Ms. Parker told him that she had driven Johnson and Mr. Correia to Mrs. Johnson's residence on the morning of her death.

¶4 Mr. Correia testified that on January 10, 2002, Ms. Parker drove Johnson and him to Mrs. Johnson's residence at approximately 9:00 A.M. Johnson had offered to give Mr. Correia money to file for divorce from his current wife, but she stated that the money was inside her coat pocket at Mrs. Johnson's home. When they arrived at the residence, Johnson went inside for approximately 15 minutes, while Mr. Correia and Ms. Parker remained inside the car. Johnson came out with two garbage bags but no coat. Ms. Parker began driving away and Johnson asked her to pull over so that she "[could] think for a second." 10 Report of Proceedings (RP) (Mar. 26, 2003) at 697. Johnson then asked Mr. Correia to return to Mrs. Johnson's home to help her clean the carpets. Johnson offered Mr. Correia $200 for his help. Mr. Correia agreed, and Ms. Parker drove them back to the residence. Ms. Parker then left. Mr. Correia estimated that they arrived back at the residence between 9:45 and 10:30 A.M.

¶5 After Ms. Parker left, Johnson told Mr. Correia that Mrs. Johnson's carpets did not need to be cleaned and that she had just wanted to talk to him alone. Mr. Correia sat down on a staircase leading from the main level to the top level of the house while Johnson began searching the top level. She initially told Mr. Correia that she was looking for her jacket, but then stated that Mrs. Johnson had $10,000 hidden in the house. She showed Mr. Correia a gun and

intimate, sexual items, which had been hidden in the bathroom. Mr. Correia testified that he did not go upstairs, but he could observe Johnson searching while he sat on the stairs. He remained seated on the stairs from 40-60 minutes.

¶6 At some point, Mr. Correia testified he heard a car pull up to the residence. Johnson told him that Mrs. Johnson had returned home, and she directed him to remain on the main level. Johnson stated that she would go downstairs to the basement to greet Mrs. Johnson and explain why they were in her home. After about five minutes, Mr. Correia heard a low screech coming from the basement. He went downstairs and discovered a person beating another person, who was lying on the floor, with a long object. The attacker was wearing a plaid shirt, gloves, and had a stocking over his or her face. Mr. Correia testified that he "freaked out" and ran toward the basement door. 10 RP at 707. As he opened the door, he heard Johnson yell his name. He realized the attacker was Johnson as she walked toward him and pulled the stocking off of her face.

¶7 Johnson led Mr. Correia outside the basement door and instructed him to wipe the door to remove their fingerprints. They went into the garage and Johnson told Mr. Correia to get inside Mrs. Johnson's van and keep his head down. Johnson returned into the house and came back out with some keys. Johnson then drove the van to her residence. She instructed Mr. Correia to change his clothes, which had blood on them, and put them into a white garbage bag. Johnson then told Mr. Correia to leave the van in a grocery store parking lot and to throw a red gift bag out the window on the way. She also told him to wipe his fingerprints off of the car and not to talk about the death. Mr. Correia complied and took the bus back to his apartment.

¶8 Detective Buckner interviewed Mr. Correia and he agreed to have police record telephone conversations between him and Johnson. Detective Buckner filed an appli-

cation for authorization to intercept and record communications or conversations under RCW 9.73.090 and .130.

¶9 The application provides in relevant part:

17.    A statement of the relevant facts concerning the investigation of Sophia S. Johnson has been set forth above. Normal investigative procedures have not been tried because it appears that Sophia Johnson has provided false statements to the investigators regarding her involvement in this case and she is likely to engage Mr. Correia in a conspiracy to cover up their involvement in the murder. The investigation will be greatly enhanced with the ability to record the conversations occurring between Correia and Johnson and any discussion, which they may have about the defendant's recent activities. Such a record of statements would be far superior to the circumstantial physical evidence and would tend strongly to corroborate existing information. Utilization of the electronically recorded conversation will present the clearest and most accurate record of what is discussed between Correia and Johnson as those discussions bear upon Johnson's own criminal liability under and would become evidence in any prosecution thereunder.

Clerk's Papers (CP) at 200-01. The court approved the authorization.

¶10 On January 13, 2002, Mr. Correia placed a call to Johnson from his home telephone, with Detective Buckner monitoring and recording the conversation. During the conversation, Johnson expressed her concern that their conversations were being recorded, and she did not make any statements admitting her involvement in Mrs. Johnson's death. However, she repeatedly warned Mr. Correia not to "say anything over the phone." CP at 205. Shortly after this telephone call, Detective Buckner received a call from Johnson. Johnson informed Detective Buckner that she had just received a disturbing phone call from Mr. Correia and that she was concerned that he might have been involved in Mrs. Johnson's death. Johnson per-

mitted Detective Buckner to tape their conversation, and she agreed to come into the police station to speak with him.

¶11 During their meeting, Johnson informed Detective Buckner that she had expected Mrs. Johnson to come to her home for lunch at 1:30 P.M. on January 10, 2002. She became concerned when Mrs. Johnson did not show up for lunch, and she went with her husband, Brad Johnson, to Mrs. Johnson's residence. When they arrived, they discovered Mrs. Johnson's body. Johnson denied going to Mrs. Johnson's home with Mr. Correia and Ms. Parker that morning.

¶12 In addition, Johnson informed Detective Buckner that on the day before her death, Mrs. Johnson had told her that she had money hidden inside her home. Johnson was aware that Mrs. Johnson had "secret" hiding places in the bathroom on the upper level of her home and in another room where she had hidden money. 14 RP (Apr. 1, 2003) at 1497. Johnson told Detective Buckner that Mr. Correia was not aware that Mrs. Johnson had money hidden in her house. In addition, Johnson stated that Mrs. Johnson's husband, Richard Johnson, also was not aware that Mrs. Johnson had hidden money in the house and that she informed him about the money after Mrs. Johnson was found dead. Johnson told Detective Buckner that she did not kill Mrs. Johnson.

¶13 By amended information, Johnson was charged with first degree felony murder during the commission of first degree robbery or, in the alternative, with second degree murder. Prior to Johnson's trial, Mr. Correia pleaded guilty to residential burglary, first degree theft, and rendering criminal assistance, arising from his entry into Mrs. Johnson's residence and aid to Johnson after the murder. He also agreed to testify against Johnson.

¶14 Johnson moved to suppress the recorded telephone conversation between Mr. Correia and herself, arguing that the application for authorization to record did not meet the requirements of RCW 9.73.130. The court ruled that the State was permitted to introduce the recording at trial

because the application was adequate. Apart from this issue concerning RCW 9.73.130, we need not recite the trial testimony or the instructional issues because we order reversal and remand, and it would serve no purpose to examine them.

¶15 Deliberations began on April 3, 2003. After four days of deliberations, juror 9 asked to be discharged from the jury. The court voir dired the foreperson and juror 9. The foreperson testified that juror 9 had expressed that she was in an emotional and physical state such that she could not continue deliberating. The foreperson further testified that juror 9 was emotionally "distraught" and when the jury began making progress toward a conclusion, juror 9 would "pull[ ] [it] back"; juror 9 was crying "a lot"; juror 9 often "retreat[ed] to the corner" to embroider and would cease communicating with the other jurors; and juror 9's condition was worsening. 17 RP (Apr. 8, 2003) at 1910-11. When questioned as to whether juror 9's behavior was impeding the deliberation process, the foreperson stated, "[i]n some ways, yes." 17 RP at 1910.

¶16 But the foreperson also testified that juror 9 was talkative and that after she retreated to go embroider, she would "come back" into the discussion. 17 RP at 1911. And when the court asked the foreperson whether the jury had to "use" deliberation time to "deal" with juror 9, the foreperson responded, "I would say it's part of the deliberation process." 17 RP at 1912. The foreperson also testified, "[I]t's not only her. I mean, there's [sic] a couple others, too." 17 RP at 1912.

¶17 Juror 9 testified that she was having difficulty because her "understanding of how a decision is made" was "confused." 17 RP at 1915. She further testified that she had been crying and experiencing stress during deliberations because the foreperson had directed the jury to "put everything away and just to sit around the table and have a discussion." 17 RP at 1916. Juror 9 stated: "I would like to see the—I'm not ready to put my notebooks away. I'm not ready to put the evidence away. I think there's more

discussion that needs to be done." 17 RP at 1916. In addition, she testified that she felt "strongly" about the jury instructions and believed that she had interpreted those instructions differently from the other members of the jury. 17 RP at 1916.

¶18 The court then asked juror 9 whether she was unable to proceed due to emotional stress. Juror 9 responded, "[M]y personality is such that I like everything balanced. Although I do not have a problem with discussion, debate, conflict, I like to see—I like to see that taken care of and go on." 17 RP at 1917. Juror 9 also stated that her personality was a "bit different from others in how the—they interpret things and how I'm interpreting things." 17 RP at 1918-19. Additionally, she noted that her son was fighting in the Iraq war but that she had received only positive news regarding his situation. The court concluded that juror 9 would remain on the jury because her problems stemmed from the inherent give-and-take of the deliberation process and not from any health or other emotional concerns.

¶19 After a short recess, the court reversed its position. The court stated that the jury foreperson had presented evidence that juror 9's behavior was "incompatible with proper and efficient jury service," noting the foreperson's testimony that juror 9 had "curl[ed] up in a ball in the corner" and ceased to communicate with the other members of the jury. 17 RP at 1924. In later proceedings, the court again stated that it made the decision to replace juror 9 based on the foreperson's testimony. The court indicated that it "found the presiding juror's information more credible and more objective." 20 RP (June 9, 2003) at 2006.

¶20 The court seated an alternate juror, and it instructed the jury to elect a new presiding juror and begin deliberations anew. Johnson moved for a mistrial, arguing that juror 9 was fit to proceed as a juror and that the jury had simply deadlocked. She further argued that by removing juror 9, the court was sending a "dynamite instruction"—that the jury must continue deliberating until it was

no longer deadlocked. 17 RP at 1921. The court denied her motion.

¶21 The jury found Johnson guilty of one count of first degree felony murder. The court then polled the jury:

Do you agree that the juror who was removed was unable to some extent to participate?

. . . .

Did she indicate that she was unable to participate either in words or actions?

And do you agree with the presiding juror's report that she was crying a lot?

Do you agree that she had—was continuing to decline in her emotional state on a daily basis?

Are you in agreement that she would physically or emotionally retreat from communicating with the jury?

And do you agree that she asked that she be removed from the jury?

Do you believe that her disability or debilitation or emotional state kept the jury from working toward a verdict?

Do you believe that the presiding juror had exercised undue influence over her? That's a yes or no. Raise your hand if yes.

No. Okay. All right.

And do you believe that you tried to have her interact in the discussion process?

And but you do agree that she seriously impaired the discussion process in reaching a verdict in this jury?

18 RP (Apr. 9, 2003) at 1948-49. The court noted that the jury generally responded unanimously in the affirmative to each of its inquiries, and the only question eliciting a unanimous, negative response was whether the presiding juror had exercised undue influence over juror 9.

¶22 Following trial, Johnson moved for a new trial, arguing that her constitutional rights to a fair trial and due process had been violated when the court removed juror 9 from the jury and because the bailiff had impermissibly communicated with the foreperson and juror 9. Addition-

ally, she argued that the court should not consider its colloquy with the jury postverdict in determining whether to grant a new trial because this questioning occurred after the jury had reached its verdict.

¶23 In an affidavit used in support of Johnson's motion for a new trial, juror 9 stated that during the course of deliberations, the bailiff frequently spoke with the foreperson. The foreperson informed the other members of the jury that the bailiff had "asked her how the deliberations were going." CP at 108. Juror 9 stated that, after speaking with the bailiff, the foreperson would "come back into the room and have a suggestion on how we could proceed." CP at 108. At one point, the foreperson asked the other jurors to change their seating positions. In addition, the foreperson spoke with the bailiff regarding what would happen if the jury became deadlocked. Juror 9 stated that, immediately after speaking with the bailiff, the foreperson informed the jury that it was "not allowed to be deadlocked" and that it "had to come to a unanimous decision." CP at 109. Juror 9 also stated that on one occasion, the bailiff was standing in the kitchen area of the jury room while the jury was deliberating.

¶24 On April 29, 2003, defense counsel interviewed the bailiff. The bailiff stated that during deliberations, she informed the judge that juror 9 and the foreperson were having a "dispute." CP at 127. The bailiff also stated that she talked to the presiding juror once a day and gave her suggestions for "deliberation techniques." CP at 128. On April 4, 2003, juror 9 and the foreperson were permitted to leave the jury room and use the bailiff's office to discuss the "deliberation process." CP at 127. The bailiff sat in the room while the jurors had a discussion and reported back to the judge. The bailiff stated that she remembered juror 9 and the foreperson discussing the deliberation process but she could not recall what she reported back to the judge. Additionally, the bailiff reported that the foreperson had asked her what would happen if the jury was hung. The bailiff informed the judge of the inquiry and the judge

responded, "not on the first day." CP at 127. The bailiff could not recall if she reported anything back to the foreperson. Defense counsel was not informed of any contacts between the bailiff and the jury.

¶25 The court denied Johnson's motion for a new trial.

## I. RCW 9.73.130(3)(f)

¶26 Johnson first contends that the court erred in admitting the recorded conversation between Mr. Correia and her. Specifically, she argues that Detective Buckner's application for authorization to record did not satisfy the requirements of RCW 9.73.130(3)(f) because it did not explain why normal police interrogation and investigative techniques would be unlikely to succeed. Johnson is in error.

■ ■ ¶27 Under RCW 9.73.130(3), an application for authorization to record communications or conversations must include:

A particular statement of the facts relied upon by the applicant to justify his belief that an authorization should be issued, including:

. . . .

(f) A particular statement of facts showing that other normal investigative procedures with respect to the offense have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to employ.

A judge issuing an intercept order has considerable discretion to determine whether the statutory safeguards have been satisfied. *State v. Cisneros*, 63 Wn. App. 724, 728-29, 821 P.2d 1262, *review denied*, 119 Wn.2d 1002 (1992). We do not review the sufficiency of the application de novo. *Cisneros*, 63 Wn. App. at 729. Rather, we will affirm if the facts set forth in the application are minimally adequate to support the court's determination. *Cisneros*, 63 Wn. App. at 729.

■ ¶28 The showing required of law enforcement under RCW 9.73.130(3)(f) is not one of absolute necessity.

*Cisneros,* 63 Wn. App. at 729. But police must either "try or give serious consideration to other methods and explain to the issuing judge why those other methods are inadequate in the particular case." *State v. Manning,* 81 Wn. App. 714, 720, 915 P.2d 1162, *review denied,* 130 Wn.2d 1010 (1996). Mere boilerplate language is antithetical to this particularity requirement. *Manning,* 81 Wn. App. at 720.

¶29 In this case, the application contains more than boilerplate recitals—it reflects consideration of other techniques and informs the court of the likelihood of their inadequacies. The application establishes that attempting to elicit information from Johnson through police interviews would be futile because she was not forthcoming regarding her involvement in the case. She informed police that she was expecting to meet Mrs. Johnson for lunch on January 10, 2002, but made no mention of the fact that she was present at Mrs. Johnson's home at the time of the murder. Additionally, the application establishes that normal investigative techniques to locate and seize items related to the crime would likely fail because Johnson had worked with Mr. Correia to conceal and destroy any evidence linking her to the murder. Mr. Correia informed police that Johnson had entered and returned from Mrs. Johnson's residence with full garbage bags, which she asked him to dispose of; thrown "something" from the window of Mrs. Johnson's van as they exited the scene of the murder; and concealed their bloody clothing. CP at 199. In light of the fact that we determine whether the facts supporting an application to record are minimally adequate to support the court's determination, the application was sufficient to support the order authorizing the interception and recording of Johnson's conversation. *See Cisneros,* 63 Wn. App. at 729.

## II. Removal of Juror

¶30 Johnson next contends that the trial court denied her constitutional rights to a fair trial and due process

when it removed juror 9 from the jury after four days of deliberations. She argues that the evidence did not support a finding that juror 9 was incapacitated or unable to proceed and that the court erred by even questioning juror 9. In response, the State argues that juror 9 was "not so much a hold out on a hung jury, as she was a disabled juror who was, for psychological or emotional reasons, unable to participate meaningfully in the jury's deliberative process." Br. of Resp't at 42. Johnson is correct.

■■ ¶31 The State argues that the correct standard of review for a trial court's decision to remove a juror is an abuse of discretion standard, citing *State v. Johnson*, 90 Wn. App. 54, 73, 950 P.2d 981 (1998). But as noted by Johnson in her reply brief, in *State v. Elmore*, 121 Wn. App. 747, 757, 90 P.3d 1110 (2004), we recently held that where a juror is "excused during deliberations for statements she made during deliberations," a defendant's constitutional rights to a fair and impartial jury are at question, and we employ a de novo standard of review. Because Johnson raises an issue of "manifest constitutional error," we review her claims de novo. *Elmore*, 121 Wn. App. at 757.

■ ¶32 A criminal defendant is entitled to trial by a fair and impartial jury. U.S. CONST. amend. VI, XIV § 1; WASH. CONST. art. I, §§ 3, 21, 22; *Duncan v. Louisiana*, 391 U.S. 145, 177, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968). Included in the right to a fair and impartial jury is the promise that a "holdout juror will not be excused for failing to deliberate or follow the law where there is some evidence that the juror simply disagrees with other jurors about the merits of the State's case." *Elmore*, 121 Wn. App. at 756. Where the record shows *any reasonable possibility* that the impetus for a juror's removal stems from his or her views on the merits of the case, the dismissal is error. *Elmore*, 121 Wn. App. at 756.

¶33 In *Elmore*, two jurors, jurors 5 and 12, notified the court that juror 8 was refusing to participate in deliberations. *Elmore*, 121 Wn. App. at 750. Juror 5 told the court that juror 8 had refused to follow the jury instructions and

that he had stated, "I don't care what the judge said. The law is shit and I won't convict anyone based on what the law says." *Elmore*, 121 Wn. App. at 750. Juror 5 also stated that juror 8 had disregarded every witness statement regarding the defendant's credibility. *Elmore*, 121 Wn. App. at 750. Juror 12 told the court that juror 8 was "Nuts[,] Criminal[,] [or] Related [to the defendant]" and that juror 8 had refused to listen to deliberations and stated that he did not care what the law said. *Elmore*, 121 Wn. App. at 750. Additionally, juror 12 stated that juror 8 would walk around, get something to eat, and "kind of ignore the whole process." *Elmore*, 121 Wn. App. at 751. When questioned by the court, juror 8 denied telling the other jurors that he did not care what the law said; rather, he told them that the jury instructions did not require a conviction if he believed the defendant rather than the State's witnesses. *Elmore*, 121 Wn. App. at 751.

¶34 The trial court removed juror 8, finding that he had refused to participate in deliberations and to follow the law. *Elmore*, 121 Wn. App. at 751. We reversed, holding that the record demonstrated a reasonable possibility that the dismissed juror had questioned the sufficiency of the State's evidence. *Elmore*, 121 Wn. App. at 749, 757.

¶35 In this case, it appears that the court removed juror 9 because it found that she was incapable of deliberating with the other members of the jury. The court stated that juror 9's behavior was "incompatible with proper and efficient jury service." 17 RP at 1924. Additionally, the court stated that it based its determination on the foreperson's testimony that juror 9 had "curl[ed] up in a ball in the corner" and had ceased to communicate with the other members of the jury. 17 RP at 1924.

¶36 Indeed, the foreperson testified that juror 9 was emotionally distraught and had been crying a lot, she frequently retreated to the corner where she would cease communicating with the other members of the jury, and that her condition was worsening and impeding the deliberations process. But juror 9's testimony told a different

story. Juror 9 indicated that she had been crying and was upset during deliberations because she took a different view of the jury instructions and other issues in the case. In addition, juror 9 disagreed with the presiding juror as to whether the jury should continue referencing its case notes and discussing the evidence. Juror 9 did not indicate at any time that she was unable to proceed due to unrelated health or emotional concerns or that she was unable or unwilling to participate in the deliberations process.

¶37 This record demonstrates that juror 9 disagreed with the other jurors at least in part because she had different views regarding the merits of the case. Nevertheless, the State argues that the court's colloquy with the jury at the conclusion of the case supports a finding that juror 9 was unable to continue deliberating. This argument is without merit because the court questioned the jury about juror 9's ability to deliberate after it had already substituted an alternate juror and after the jury returned its verdict; the jury's responses could not have factored into the judge's determination to remove juror 9.

¶38 Moreover, by finding that the presiding juror was credible and that juror 9 was not, the court "improperly intruded into the jury deliberations, becoming in essence a thirteenth and presiding juror to rule on what the jurors said during deliberation." *Elmore*, 121 Wn. App. at 757. A court may not enter into a jury's deliberations for the purpose of ruling on conflicting reports about the jurors' discussions. *Elmore*, 121 Wn. App. at 757.

¶39 The trial court violated Johnson's constitutional rights when it removed juror 9 from the jury. As in *Elmore*, the record discloses a reasonable probability that juror 9 had questioned the sufficiency of the State's case—even if she had at times retreated from deliberations.

### III. Improper Ex Parte Communications with Jury

¶40 Lastly, Johnson asserts that the court erred in denying her motions for a mistrial and for a new trial

because the bailiff improperly communicated with the jury during deliberations. In a criminal proceeding, a new trial is necessitated only when the defendant has been so prejudiced that nothing short of a new trial can ensure that the defendant will be treated fairly. *State v. Bourgeois*, 133 Wn.2d 389, 406, 945 P.2d 1120 (1997). We review a trial court's denial of a new trial for an abuse of discretion. *Bourgeois*, 133 Wn.2d at 406. An abuse of discretion occurs only when no reasonable judge would have reached the same conclusion. *Bourgeois*, 133 Wn.2d at 406.

¶41 A bailiff is forbidden to communicate with the jury during deliberations except to inquire if it has reached a verdict, or to make innocuous or neutral statements. *State v. Booth*, 36 Wn. App. 66, 68, 671 P.2d 1218 (1983). When an ex parte communication occurs, the trial court generally should disclose the communication to counsel for all parties. *Bourgeois*, 133 Wn.2d at 407. Although an improper communication between the bailiff and the jury is a constitutional error, the communication may be so inconsequential as to constitute harmless error. *Bourgeois*, 133 Wn.2d at 407. Once a defendant raises the possibility that he or she was prejudiced by an improper communication between the court and the jury, the State bears the burden of showing that the error was harmless beyond a reasonable doubt. *Bourgeois*, 133 Wn.2d at 407. We do not consider a juror's statement as to whether the communication influenced the jury; we can only attempt to discover what was said and examine the remarks for their possible prejudicial impact. *Booth*, 36 Wn. App. at 69.

¶42 In denying Johnson's motion for a new trial, the court stated that in every trial, "there happens to be quite a bit of contact between the bailiff and their [sic] jurors." 20 RP at 2003. The court noted that this bailiff was well-trained in the management of juries as well as her procedural duties. The court found that Johnson had failed to demonstrate a possibility of prejudice by the communications between the bailiff and the jury because the record is unclear as to what the bailiff actually told the foreperson or juror 9.

¶43 But communications did take place between at least two jurors and the bailiff. When a judge delegates part of his or her official duties to a bailiff, such as during the deliberation process, the bailiff is the judge's agent and is subject to the same restrictions as the court regarding conversations with the jury. *Adkins v. Clark County*, 105 Wn.2d 675, 678, 717 P.2d 275 (1986). Although the judge is in charge of the jury, the bailiff is viewed by the jury as speaking on behalf of the judge. *Adkins*, 105 Wn.2d at 678. Here, the bailiff spoke with the foreperson to inquire how deliberations were proceeding and to offer suggestions for making the process run more smoothly. These actions were highly improper.

¶44 As well, the court failed to notify defense counsel regarding these communications and denied defense counsel's motion for a full evidentiary hearing on the circumstances of the juror's removal, the bailiff's contacts with the jury, and the trial court's communications with the panel during deliberations. This denied the defense the opportunity to investigate or present a complete factual record. This error cannot be presumed harmless. We reverse and order a new trial before a different judge.

¶45 Reversed and remanded.

QUINN-BRINTNALL, C.J., and HOUGHTON, J., concur.