IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31694-7-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JASEN L. BERTRAM, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — Jasen Bertram shot and killed Cody Johnson in Mr. Johnson's travel trailer late one night in June 2012. The principal disputed issue when Mr. Bertram was tried for the first degree murder of Mr. Johnson, first degree robbery, and possession of a stolen firearm, was whether Mr. Bertram had acted in self-defense. The jury concluded that he did not. It found him guilty of the lesser degree charge of second degree murder and the other two counts.

Mr. Bertram contends on appeal that the trial court erred when it refused to modify the Washington pattern "first aggressor" jury instruction by adding his proposed language that "words alone are not sufficient provocation to cause another person to respond belligerently." Clerk's Papers (CP) at 155. He also contends that insufficient evidence supports each of his three convictions. In a statement of additional grounds (SAG), Mr. Bertram contends he received ineffective assistance of counsel, the trial court erred in denying his motion for a mistrial, and cumulative error deprived him of a fair trial.

Finding sufficient evidence and no error or abuse of discretion, we affirm.

FACTS AND PROCEDURAL BACKGROUND

Bridgette Jack-Lee is the daughter of Bill Jack, a good friend of Jasen Bertram since 2003, when Ms. Jack-Lee would have been about 12 years old. Mr. Bertram knew Ms. Jack-Lee through outings with her father and family; Ms. Jack-Lee was a tomboy when young and participated in snowmobiling and motocross with her father. As she reached her late teens, however, Ms. Jack-Lee struggled with drug addiction, as Mr. Bertram learned from Mr. Jack.

A couple of weeks before Cody Johnson was killed, Mr. Bertram and his own daughter, Caitlin, who was a couple of years older than Ms. Jack-Lee, visited with Mr. Jack. Mr. Bertram asked how Ms. Jack-Lee was doing. Mr. Jack answered that he didn't know where she was but "knew that whatever was happening probably wasn't good." Report of Proceedings (RP) at 542. Knowing that Ms. Jack-Lee did not get along with her stepmother (Mr. Bertram described them as "clash[ing] heads") Mr. Bertram offered to contact Ms. Jack-Lee and obtained her telephone number from her father. RP at 708. Mr. Bertram thereafter sent her a text message asking how she was doing and saying that he would be there for her if she needed him.

On the Thursday or Friday before Mr. Johnson was killed, Ms. Jack-Lee contacted Mr. Bertram to say she was having a rough time and needed help. The two met at a park, where Ms. Jack-Lee told Mr. Bertram that she had been involved in a relationship for

2

several months with Mr. Johnson, who was a drug dealer. She left him and contacted Mr. Bertram after overhearing a discussion between Mr. Johnson and his "partner in crime," Jason Hansch, in which Mr. Hansch encouraged Mr. Johnson to use a pipe bomb to kill her. RP at 671, 693, 695. When Ms. Jack-Lee heard Mr. Johnson respond, loudly, that "she's a smart girl . . . . If I tell her to leave, she'll leave," she took it as her cue "to basically get out of there." *Id.* at 693. Her description of Mr. Johnson was that he could be threatening; he had guns and was constantly armed with a .45 Springfield handgun that was his favorite.

Mr. Bertram encouraged Ms. Jack-Lee to get away from Mr. Johnson and outlined some options; Ms. Jack-Lee said she would like to stay with Mr. Bertram at his house in Wenatchee for a few days while she went through withdrawals and then try to get into rehab the following week. Mr. Bertram agreed, and over the next few days, he and Caitlin, who was living with him, fed and encouraged Ms. Jack-Lee as she struggled through withdrawals. They also helped her collect clothing she had left at various places. One of the places that Mr. Bertram drove to with Ms. Jack-Lee was the small travel trailer in Dryden where Mr. Johnson lived. Mr. Johnson's was the last of several trailers parked in an area surrounded by an orchard and located near a river. Across the street from the trailer were several small cabins, rented to river raft instructors, and a community shower and toilets. There was no response when Mr. Bertram and Ms. Jack-Lee stopped at Mr. Johnson's trailer, so they left without going inside.

3

On Sunday evening, June 3, Mr. Bertram left to run a quick errand and told Ms. Jack-Lee he would be right back. Caitlin was out with friends. Unbeknownst to Mr. Bertram, Ms. Jack-Lee had been speaking with Mr. Johnson by phone while staying at the Bertram home, and had received a text from Mr. Johnson earlier that day asking her to come back to his place in Dryden. Mr. Johnson had arranged with an acquaintance to pick her up and drive her. She used Mr. Bertram's errand and Caitlin's absence as her opportunity to escape.

Upon arriving in Dryden, Ms. Jack-Lee spent the evening getting high with Mr. Johnson and his friends. According to her, she got "extremely high" on heroin and methamphetamine. RP at 580.

When Mr. Bertram returned from his errand and found Ms. Jack-Lee gone, he sent her a text message asking where she was and received a response that she was hanging out with friends down the street. When she stopped responding to his text messages around 9:30 or 10:00 p.m., Mr. Bertram "decided to take a shot at it and go see if I could find her." RP at 735. He got in his truck and drove to a few places he thought she might be, but to no avail. He then decided to drive to Mr. Johnson's trailer in Dryden.

Mr. Bertram usually kept a Glock .40 handgun in his truck and he armed himself with it before approaching Mr. Johnson's trailer; according to him, this was based on Ms. Jack-Lee's statement that Mr. Johnson ordinarily had a gun close at hand. Mr. Bertram claims to have acquired the Glock .40 several years earlier by finding it abandoned next

to a garbage can at a concert venue at the Columbia River Gorge, where he was then working as a bartender. He claimed that under the circumstances, he believed he owned it. For a reason he would later prove unable to explain, Mr. Bertram also took with him a balaclava: a mask that would cover his head and neck, with only a hole for his eyes.

Mr. Bertram arrived at the trailer and cabin area where Mr. Johnson lived around 11:00 p.m. The cabin dwellers across the street were having a party and loud music was playing but Mr. Johnson's guests had left. Mr. Bertram parked a few hundred feet from the trailer and walked the rest of the way.

According to Mr. Bertram, he encountered Ms. Jack-Lee outside of the trailer "puking her guts up," and tried talking her into leaving with him. RP at 741. When she said she needed to go to the bathroom across the street, he said he would get her belongings from Mr. Johnson.

Mr. Bertrand claims that after Ms. Jack-Lee left for the bathroom, he knocked on the trailer door. When Mr. Johnson came to the door, Mr. Bertram said he was a family friend of Ms. Jack-Lee's and wanted to get her stuff and take her home. After some initial disagreement over whether Ms. Jack-Lee was there, Mr. Bertram claims that Mr. Johnson said, something like, "fine. . . . Take the stuff. I don't need this trouble from the bitch." RP at 744. Mr. Johnson then stepped back into the trailer, leaving the door open.

Mr. Bertram followed him in but claims that as he stepped into the trailer, Mr. Johnson suddenly charged at him and hit him behind the left ear, yelling, "[G]et the fuck

5

out." RP at 746. In response, Mr. Bertram swung at Mr. Johnson with a Maglite flashlight he was carrying, hitting him in the back of the head. According to Mr. Bertram, he told Mr. Johnson, "We don't need to be doing this. I'll just get her stuff and go," but Mr. Johnson turned away and told him, again, to "get out." RP at 747.

Mr. Bertram claims that he complied and stepped toward the door, but he sidestepped to keep an eye on Mr. Johnson. As he did, he claims Mr. Johnson turned to face him, with something shiny in his hand. Mr. Bertram was "pretty sure" it was the .45 he had heard about from Ms. Jack-Lee. RP at 748. He responded by pulling the Glock .40 out of his pocket, yelled at Mr. Johnson to put his gun down, and then pulled the trigger on the Glock three times. According to Mr. Bertram, Mr. Johnson was crouching when he pulled the trigger and he fell to the floor.

Mr. Bertram had never pulled a gun on anyone or shot at anyone before and describes his mind as "racing." RP at 749. He grabbed a coat hanging next to the door, put it over Mr. Johnson, and began grabbing some of Ms. Jack-Lee's belongings. Although he claims not to have realized it at the time, he left his Glock .40 in the trailer and took Mr. Johnson's Springfield .45 with him instead. Police officers would later find the Glock on the bed in Mr. Johnson's trailer, covered by Mr. Bertram's balaclava.

Ms. Jack-Lee had a different version of events on the night of the shooting. According to her, when Mr. Bertram arrived at the trailer, she must have been in the community bath facility, taking a shower, and did not see him arrive. She finished her

6

shower and was returning to the trailer when she saw that it was shaking, "like there was [sic] people wrestling around in there," and heard someone inside yell, "Get the fuck on the ground." RP at 571, 662. Fearing that the intruder or intruders might be dangerous drug dealers, she ran back to the bath facility.

She didn't hear shots while there, perhaps due to the loud music playing next door. After a short time, she decided to return to the trailer and found its door ajar. When she looked in, she saw Mr. Johnson on the floor, covered with his jacket, and saw blood splatter on the wall. She "immediately took off running again," this time toward Wenatchee. RP at 574.

Mr. Bertram encountered Ms. Jack-Lee as she was running down the road and told her to get into his truck. As they drove away, she claims that he threw something—she didn't know what—out of the truck. According to her, Mr. Bertram told her that evening or the next morning that he had gone into the trailer, hit Mr. Johnson in the back of the head with a flashlight, and when that did not faze him, pulled out the gun, told Mr. Johnson to get on the ground, and then shot him. According to Ms. Jack-Lee, Mr. Bertram said Mr. Johnson "was begging or asking him, what did he do, what did he do, and then he shot him." RP at 574. She also said Mr. Bertram said that he felt good about what he had done. Ms. Jack-Lee claims that the morning after he killed Mr. Johnson, Mr. Bertram showed her a bag of heroin that he had taken from Mr. Johnson's trailer. Mr.

7

Bertram denies telling Ms. Jack-Lee that he stole heroin from Mr. Johnson's trailer, or that Mr. Johnson ever begged for his life.

That same morning, Mr. Bertram learned from Ms. Jack-Lee's parents that the police were looking for her. Mr. Bertram told her that he intended to report to police what had happened, but he needed to retain a lawyer first. He dropped her off at the home of her friend, telling her that she, too, should speak to a lawyer before going to the police. Ms. Jack-Lee's friend took her to a motel to hide out, but Wenatchee police tracked her down the next day and she agreed to speak with them. Although she was not initially forthcoming about all that she knew, she provided enough information that officers contacted Mr. Bertram, interviewed him, and then obtained a search warrant for Mr. Bertram's home.

At trial, the State presented evidence that the bullets that killed Mr. Johnson were fired from the Glock. They presented evidence that Mr. Johnson's gun and Mr. Bertram's Maglite flashlight, with Mr. Johnson's blood on it, had been found on the side of the road about a quarter mile from Mr. Johnson's trailer, consistent with Ms. Jack-Lee's testimony that Mr. Bertram had thrown something out of the truck. It presented expert testimony that all of Mr. Johnson's injuries—the blow to his head and all three shots—had come from behind and had been fired while Mr. Johnson was kneeling or otherwise close to the ground. It presented DNA evidence tying Mr. Bertram to the Glock and to the balaclava found in the trailer.

8

The State also called as a witness Dana Dilts, a friend of Mr. Bertram's, who testified that Mr. Bertram told her he entered Mr. Johnson's trailer by kicking the door in, hit Mr. Johnson in the head with a flashlight, shot him three times in the chest, and then covered his body with a coat. She testified that Mr. Bertram told her he used a gun that he had stolen from the Gorge concert venue, thereby providing support for the State's charge of possession of a stolen weapon. She testified that he told her he had taken a gun and heroin from Mr. Johnson's trailer, thereby providing support for the charge of first degree robbery. She testified that he told her he had later thrown Mr. Johnson's gun into an orchard. Mr. Bertram admitted that he had spoken with Ms. Dilts about events on the night of the shooting but denied making most of the incriminating statements she attributed to him.

The jury found Mr. Bertram guilty of the lesser degree offense of second degree murder and guilty as charged with first degree robbery and possession of a stolen weapon. Mr. Bertram appeals.

## ANALYSIS

Mr. Bertram makes four assignments of error: two arising out of the court's giving the Washington pattern "first aggressor" instruction to the jury, and two challenges to the sufficiency of the evidence to support the jury's findings of guilt. We first address the alleged instructional errors and then turn to the sufficiency of the evidence.

## I. *Alleged instructional error*

Because Mr. Bertram presented sufficient evidence of self-defense, the trial court instructed the jury on that defense and on the State's burden of proving beyond a reasonable doubt that it did not apply. It also gave the Washington pattern "first aggressor" jury instruction explaining how someone who provokes aggression may lose the right to assert self-defense.

Although self-defense is available in response to the unlawful use of force, one who provokes another to lawfully act in self-defense is not responding to unlawful force and therefore has no right of self-defense. *State v. Riley*, 137 Wn.2d 904, 909-10, 976 P.2d 624 (1999). In other words, "one who provokes an affray cannot invoke the right of self-defense." *State v. Bea*, 162 Wn. App. 570, 575, 254 P.3d 948 (2011). A Washington pattern instruction "properly directs the jury to determine whether the defendant's acts precipitated a confrontation with the victim." *State v. Wingate*, 155 Wn.2d 817, 821, 122 P.3d 908 (2005), *aff'd*, 174 Wn. App. 1050, 2013 WL 4018008. It states:

> No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self defense [sic] and thereupon kill another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that the defendant's acts and conduct provoked or commenced the fight, then self-defense is not available as a defense.

CP at 186 (Instruction 21); *see* 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY

INSTRUCTIONS: CRIMINAL 16.04, at 241 (3d ed. 2008) (WPIC) ("Aggressor—Defense of

Self").

A first aggressor instruction is appropriate where "(1) the jury can reasonably

determine from the evidence that the defendant provoked the fight; (2) the evidence

conflicts as to whether the defendant's conduct provoked the fight; or (3) the evidence

shows that the defendant made the first move by drawing a weapon." *State v. Anderson*,

144 Wn. App. 85, 89, 180 P.3d 885 (2008) (citing *Riley*, 137 Wn.2d at 909-10)).

"A first aggressor instruction potentially removes self-defense from the jury's

consideration, relieving the State of its burden of proving that a defendant did not act in

self-defense." *Bea*, 162 Wn. App. at 575-76. Accordingly, it should only be given "in

cases where the theories of the case cannot be sufficiently argued and understood by the

jury without such an instruction." *Id.* at 576. To justify a first aggressor instruction, the

State need only produce "some evidence" that the defendant was the first aggressor.

*Anderson*, 144 Wn. App. at 89.

Mr. Bertram did not object to the court giving a first aggressor instruction; in fact,

he proposed his own.[1] But his proposed instruction modified the pattern instruction by

---

[1] Mr. Bertram's first assignment of error is to the trial court giving the pattern instruction and his second is to the court refusing to give his proposed instruction. But his single argument is that the court gave the instruction without including what he contends was his necessary modification.

inserting the sentence, "However, words alone are not sufficient provocation to cause another person to respond belligerently," CP at 155, relying on *Riley*, 137 Wn.2d at 911, as support.

When the court did not accept the modified instruction and an opportunity was provided for the lawyers to state any objections to the court's instructions, Mr. Bertram's only objection was that the court was not giving the instruction in the form he had proposed. Responding to Mr. Bertram's objection, the court explained that it believed Mr. Bertram's proposed instruction was potentially an inaccurate statement of the law because

> if you make a threat to kill, that's just words alone, but if it reasonably appears from the circumstances that I'm going to carry through with my threat to kill, then potentially you could act upon my words alone and fall into justifiable homicide.

RP at 816.

Jury instructions are proper if "substantial evidence supports them, they allow the parties to argue their theories of the case, and, when read as a whole, they properly inform the jury of the applicable law." *State v. Hathaway*, 161 Wn. App. 634, 647, 251 P.3d 253 (2011). If a party proposes an instruction that properly states the law and is supported by the evidence, it is reversible error to refuse to give the proposed instruction. *Id.* A trial court does not err, however, by "refus[ing] a specific instruction when a more

12

general instruction adequately explains the law and allows each party to argue its case theory." *Id.*

The proposition Mr. Bertram sought to add to the pattern first aggressor instruction is supported by *Riley*, as he contends. The defendant in *Riley* was convicted of first degree assault while armed with a deadly weapon after he shot Gustavo Jaramillo. *Riley*, 137 Wn.2d at 906-07. At trial, Mr. Riley claimed he shot Mr. Jaramillo in self-defense. *Id.* at 907. He claimed that he teased Mr. Jaramillo about being a street gang "wanna-be," Mr. Jaramillo was offended and said he was going to shoot Mr. Riley, Mr. Riley then pulled out his own gun and demanded that Mr. Jaramillo turn over his weapon, and Mr. Riley shot Mr. Jaramillo only when Mr. Jaramillo was reaching for his gun with aggression rather than to relinquish it to Mr. Riley. *Id.* at 906-07.

The trial court instructed the jury on self-defense, and also gave a first aggressor instruction. *Id.* at 907. Mr. Riley objected that his only act provoking Mr. Jaramillo's belligerent response was that he called Mr. Jaramillo a "wanna-be." He contended that giving the instruction violated his right of free speech and prevented him from arguing his theory of self-defense. *Id.* at 908-09.

The court held that the instruction was properly given because there was evidence of aggressive non-speech conduct on Mr. Riley's part—namely, that Mr. Riley drew his gun first and aimed it at Mr. Jaramillo. *Id.* at 909, 913. But it agreed with the defense that "words alone do not constitute sufficient provocation" and "the giving of an

13

aggressor instruction where words alone are the asserted provocation would be error

completely aside from any First Amendment issue." *Id.* at 911. It also observed that the

pattern instruction given did not wrongly suggest to the jury that words alone would be

enough provocation to foreclose a claim of self-defense. The instruction spoke instead of

"any intentional *act* reasonably likely to provoke . . . ." *Id.* at 913 (internal quotation

marks omitted) (quoting WPIC 16.04, at 241 (3d ed. 2008)).

As Mr. Bertram's appellate lawyer recognizes, if the State's evidence of Mr.

Bertram's provocation was words alone, then under *Riley* the first aggressor instruction

should not have been given at all. Nonetheless, he argues that Mr. Bertram should at

least have gotten the modified instruction he requested. Relying on the fact that Mr.

Bertram is the only living witness to his shooting of Mr. Johnson, he argues that

> [W]ords alone were the only provocation that could possibly have been
> asserted as there was no evidence of any other provoking act or conduct
> . . . . Other than his words, the State produced no evidence showing Mr.
> Bertram was the aggressor. He did not provoke the fight; there is no
> conflicting evidence; and he did not make the first move by drawing his
> weapon.

Br. of Appellant at 18.

Mr. Bertram's argument fails to consider the testimony of Ms. Jack-Lee and Ms.

Dilts. Mr. Bertram's statements to the two women, being admissions of a party-

opponent, are not hearsay. ER 801(d)(2). Where their reports conflicted with Mr.

Bertram's own testimony as to events, the jury was free to believe what the women

14

claimed they were told by Mr. Bertram and to reject his self-serving trial testimony. Mr. Bertram also fails to consider circumstantial evidence suggesting that he was meting out vigilante justice rather than acting in self-defense. "The elements of a crime can be established by both direct and circumstantial evidence," *State v. Thompson*, 88 Wn.2d 13, 16, 558 P.2d 202 (1977), *abrogated on other grounds by In re Pers. Restraint of Andress*, 147 Wn.2d 602, 56 P.3d 981 (2002), and circumstantial evidence is considered just as reliable as direct evidence. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

Whether the State produced sufficient evidence to justify an initial aggressor instruction is a question of law that we review de novo. *Anderson*, 144 Wn. App. at 89. In determining if the evidence at trial was sufficient to support the giving of an instruction, we view the supporting evidence in the light most favorable to the party requesting the instruction. *Bea*, 162 Wn. App. at 577.

The State presented evidence that Mr. Bertram entered Mr. Johnson's trailer, unwelcomed, likely wearing a mask and armed with the Glock. Dana Dilts testified that Mr. Bertram told her he entered Mr. Johnson's trailer by kicking the door in. Ms. Jack-Lee testified that when returning to the trailer from her shower, the trailer was shaking and she heard someone, evidently Mr. Bertram, yelling, "Get the fuck on the ground." RP at 571. According to Ms. Jack-Lee, Mr. Bertram told her that he went into the trailer, hit Mr. Johnson in the back of the head with a flashlight, and when that did not faze him, pulled out the gun, told Mr. Johnson to get on the ground, and then shot him. Ms. Jack-

15

Lee testified that Mr. Bertram admitted that Mr. Johnson was on the ground, begging, when Mr. Bertram shot him from above.

The first aggressor instruction was properly given without the modification proposed by Mr. Bertram.

## II. Sufficiency of the evidence

Mr. Bertram's third and fourth assignments of error are to the sufficiency of the evidence to support his convictions of second degree murder, first degree robbery, and possession of a stolen firearm.

In reviewing a defendant's challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State and determine "whether any rational trier of fact could have found the elements of the charged crime beyond a reasonable doubt." *State v. Brown*, 162 Wn.2d 422, 428, 173 P.3d 245 (2007). "A reviewing court need not be convinced of the defendant's guilt beyond a reasonable doubt, but only that substantial evidence supports the State's case." *State v. Boyle*, 183 Wn. App. 1, 7, 335 P.3d 954 (2014), *review denied*, 357 P.3d 666 (2015). Substantial evidence means evidence in the record of a sufficient quantity to persuade a fair-minded, rational person of the truth of the finding. *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994). We defer to the fact finder "on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d

970 (2004), *abrogated in part on other grounds by Crawford v. Wash.*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

*Second degree murder.* Mr. Bertram's first sufficiency challenge is to his conviction for second degree murder. To find Mr. Bertram guilty of second degree murder, the jury was required to find that he (1) intended to cause the death of Mr. Johnson but did not act with premeditation, (2) caused the death of Mr. Johnson, and (3) that the killing was not justified on the basis of self-defense. RCW 9A.32.050(1)(a); RCW 9A.32.050.[2] Mr. Bertram contends the State failed to disprove self-defense beyond a reasonable doubt.

"In Washington, self-defense is defined by statute." *State v. Janes*, 121 Wn.2d 220, 237, 850 P.2d 495 (1993). Under RCW 9A.16.050, homicide is justifiable when committed

> [i]n the lawful defense of the slayer . . . when there is reasonable ground to
> apprehend a design on the part of the person slain . . . to do some great
> personal injury to the slayer . . . and there is imminent danger of such
> design being accomplished.

---

[2] A person is guilty of murder in the second degree if, "[w]ith intent to cause the death of another person but without premeditation, he or she causes the death of such person . . . ." RCW 9A.32.050(1)(a). A person acts intentionally "when he or she acts with the objective or purpose to accomplish a result which constitutes a crime." RCW 9A.08.010(1)(a).

RCW 9A.16.050(1). As previously discussed, however, if the jury found that Mr. Bertram provoked aggression on Mr. Johnson's part, then self-defense was not an available defense.

For reasons already discussed, the State presented enough evidence of aggressive action on Mr. Bertram's part to support giving the unmodified pattern first aggressor instruction. The same evidence that supports giving that instruction would support a finding by the jury that Mr. Bertram was the first aggressor and not entitled to assert self-defense. No further analysis is needed.

*First Degree Robbery.* Mr. Bertram next argues that the evidence was insufficient to prove that he committed first degree robbery. Although he admitted at trial that he picked up and left the trailer with Mr. Johnson's .45, he argues "the defense showed Mr. Bertram did not even know he had Mr. Johnson's .45 until later and had no intent to commit a theft as required . . . for first degree robbery." Br. of Appellant at 22.

To prove that Mr. Bertram was guilty of first degree robbery, the State was required to prove

> (1) That on or about the 4th day of June, 2012, the defendant unlawfully took personal property from the person or in the presence of another;
> (2) That the defendant intended to commit theft of the property;
> (3) That the taking was against the person's will by the defendant's use of immediate force, violence, or fear of injury to that person;
> (4) That force or fear was used by the defendant to obtain or retain possession of the property or to prevent or overcome resistance to the taking;

18

(5) That in the commission of these acts the defendant inflicted bodily injury; and

(6) That any of these acts occurred in the State of Washington.

CP at 189. "The intent required to prove first degree robbery is the intent to deprive the victim of property." *State v. Webb*, 162 Wn. App. 195, 209, 252 P.3d 424 (2011).

While Mr. Bertram attributed his departure from the trailer with Mr. Johnson's .45 to confusion, the State presented evidence that the two guns look nothing alike in terms of size or color; Mr. Bertram admitted as much in cross-examination. The prosecutor also elicited testimony from Mr. Bertram that he didn't take the .45 out of Mr. Johnson's hand; instead, "It dropped out of his hand when I shot him." RP at 778. The prosecutor then asked:

> Q. So instead, you put your gun down on the bed, as the picture shows, because the gun is right underneath the mask, and then you have to reach down and pick up that gun in order to put that gun in your pocket, and you didn't see that it's the silver gun, you just picked up the gun and put it in your pocket. Is that what you're saying?

*Id.* To which Mr. Bertram answered, "Yeah." *Id.*

Presented with undisputed evidence that the two guns look nothing alike and that Mr. Bertram picked up the .45 from the floor, where it had fallen from Mr. Johnson's hand, the jury was not required to accept Mr. Bertram's self-serving testimony that he inadvertently took the wrong handgun out of shock and confusion. It had also been presented with the testimony of Ms. Dilts and Ms. Jack-Lee that Mr. Bertram had taken a

19

bag of heroin. Viewed in the light most favorable to the State, a rational trier of fact could find the requisite intent to commit theft of property.

*Possession of Stolen Firearm.* Mr. Bertram finally contends that insufficient evidence supports his conviction of possession of a stolen firearm. The State was not required to prove that Mr. Bertram had "actual and positive knowledge" that the Glock .40 was stolen. *State v. Rye*, 2 Wn. App. 920, 927, 471 P.2d 96 (1970). Rather, "[i]t is sufficient if [the defendant] had knowledge of facts sufficient to put him on notice that [it] w[as] stolen." *State v. Rockett*, 6 Wn. App. 399, 402, 493 P.2d 321 (1972).

Here again, Mr. Bertram focuses solely on his own evidence. According to Mr. Bertram, "the defense established Mr. Bertram did not know the Glock was stolen and figured it was just lost when he picked it up by the garbage can at the Gorge," and therefore the State could not show that he had the requisite knowledge that the gun had been stolen. Br. of Appellant at 22.

The jury heard testimony from Jeffrey Casady, from whom the Glock was stolen two years earlier during a concert at the Gorge, that the gun was in his backpack that he set down during the concert for "[n]o more than five minutes." RP at 599. And the State presented testimony from Mr. Bertram's friend, Ms. Dilts, that Mr. Bertram told her the Glock was a stolen weapon:

> Q. Did he tell you about that gun, where he got the gun?
> A. Yes, he got it at the Gorge where he used to work.
> Q. Did he tell you if it was his or—

20

A. It was a stolen weapon.
Q. He told you he knew that?
A. Yes.

RP at 551. Ms. Dilt's testimony alone is sufficient evidence to support the element of

knowledge that the Glock was stolen.

## STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of additional grounds, Mr. Bertram raises three. The first is

that he received ineffective assistance of counsel. The second is that the trial court erred

in refusing to grant a mistrial. The third is that cumulative error deprived him of a fair

trial. We address his contentions in turn.

*Ineffective Assistance of Counsel.* Mr. Bertram claims he received ineffective

assistance of counsel because his trial attorney failed to investigate known witnesses or

call witnesses to support his self-defense claim. In particular, Mr. Bertram claims his

lawyer failed to interview the State's primary medical expert, Dr. Gail Fino, before trial;

that his lawyer should have called an expert of his own to rebut Dr. Fino's testimony; and

that his lawyer failed to interview Mr. Hansch, Ms. Jack-Lee, and others who "knew Mr.

Johnson's propensity for dealing drugs and using extreme violence." SAG at 4.

To prevail on a claim of ineffective assistance of counsel, a defendant must prove

(1) defense counsel's representation fell below an objective standard of reasonableness

and (2) the deficient representation prejudiced the defendant. *Strickland v. Washington,*

466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).

There is nothing in the record on appeal that establishes who Mr. Bertram's trial lawyer did or did not interview, or whether some expert other than the expert who was called by the defense was available to better rebut Dr. Fino's testimony. Insofar as Mr. Bertram's arguments depend on information outside the record on appeal, his remedy is to pursue a personal restraint petition. *McFarland*, 127 Wn.2d at 335.

*Denial of Motion for Mistrial.* Mr. Bertram next contends the trial court erred in denying his motions for a mistrial because jurors improperly communicated with the bailiff.

Mr. Bertram first moved for a mistrial after the parties were informed by the court that a juror approached the bailiff following the testimony of Dr. Fino and expressed frustration with the fact that she referred to a deposition or a book of some other sort during her testimony, with no indication to the jury as to what the book was. Outside the presence of the jury, the bailiff testified to what the juror had said and the fact that her comments were made in the presence of other jurors. The bailiff testified that she told the juror she would "speak to the judge about her concerns." RP at 388. Defense counsel argued that, by stating that she would take the issue to the judge, the bailiff "actually suggested a solution to the juror's problem that we now know about." RP at 390. Because the exchange took place in the presence of other jurors, the defense argued that

22

excusing the tainted juror would not remedy the error, and therefore a mistrial was necessary.

The court denied the motion for a mistrial, explaining that while the juror had violated the Court's instructions by discussing the case before the conclusion of the evidence, it was a "one-sided discussion," with no response from the bailiff, and the juror's expression of frustration "[did] not appear to be particularly favorable to either side in that it is a somewhat neutral criticism as to both." RP at 395. It also gave the following curative instruction to the jury:

> At the beginning of the morning recess, a discussion with [the bailiff] occurred at the threshold of the courtroom door. If any of you overheard this conversation, you are to disregard such conversation and comment in its entirety.

RP at 400. The court then told the jury not to ask the bailiff anything about the case and repeated its general instructions regarding outside influences.

Later in the trial, the bailiff reported that a second juror had approached her and asked her about the profession of one of the witnesses. The bailiff responded, "I can't answer that and you're not supposed to discuss it," which ended the conversation. RP at 432. Defense counsel again moved for a mistrial, without articulating any prejudice from the juror's comment. The court broadened the instruction regarding the role of the bailiff, reminding the jury not to ask the bailiff "anything about the facts, testimony, the law or any other evidence in this case," nor to repeat testimony. RP at 434-35.

23

The decision to grant or deny a motion for a mistrial is addressed "to the sound discretion of the trial court," *State v. Tigano*, 63 Wn. App. 336, 342, 818 P.2d 1369 (1991), and will be disturbed on appeal "only where the trial court abused its discretion or erroneously interpreted the law." *State v. Boyle*, 183 Wn. App. at 12. "An abuse of discretion occurs only when no reasonable judge would have reached the same conclusion." *State v. Johnson*, 125 Wn. App. 443, 460, 105 P.3d 85 (2005).

"In a criminal proceeding, a new trial is necessitated only when the defendant has been so prejudiced that nothing short of a new trial can ensure that the defendant will be treated fairly." *Id.* at 460; CrR 7.5(a) (court will grant a new trial only "when it affirmatively appears that a substantial right of the defendant was materially affected"). "Something more than a possibility of prejudice must be shown to warrant a new trial." *State v. Lemieux*, 75 Wn.2d 89, 91, 448 P.2d 943 (1968).

It is well settled that there should be no communication between the court and the jury in the defendant's absence. *State v. Caliguri*, 99 Wn.2d 501, 508, 664 P.2d 466 (1983). Because a bailiff is the spokesman for the court, and in a sense the "alter-ego" of the judge, bailiffs are subject to the same constraints as the trial judge. *State v. Bourgeois*, 133 Wn.2d 389, 407, 945 P.2d 1120 (1997) (quoting *O'Brien v. City of Seattle*, 52 Wn.2d 543, 548, 327 P.2d 433 (1958)). Thus, "an improper communication between the bailiff and the jury is a constitutional error." *Johnson*, 125 Wn. App. at 460.

24

Even when such an error occurs, however, "the communication may be so inconsequential as to constitute harmless error." *Id.*; *Caliguri*, 99 Wn.2d at 509 (refusing to apply a conclusive presumption of prejudice arising from improper communications between the court and jury). While the State bears the burden of showing that the error was harmless beyond a reasonable doubt, the defendant must first raise the possibility that he was prejudiced by the improper communication between the court and the jury. *Johnson*, 125 at 460; *State v. Jasper*, 158 Wn. App. 518, 541, 245 P.3d 228 (2010), *aff'd,* 174 Wn.2d 96, 271 P.3d 876 (2012).

Mr. Bertram has not shown a possibility that he was prejudiced. The bailiff did not comment on the case in response to the second juror's question and her only response to the first juror's statements was that she would bring the juror's concern to the attention of the judge; she "communicated no information to the jury that was in any manner harmful to the [defendant]." *State v. Johnson*, 56 Wn.2d 700, 709, 355 P.2d 13 (1960). "Generally, where the trial court's response to a jury inquiry is 'negative in nature and conveys no affirmative information,' no prejudice results and the error is harmless." *Jasper*, 158 Wn. App. at 541 (quoting *State v. Russell*, 25 Wn. App. 933, 948, 611 P.2d 1320 (1980)).

Because any error was harmless, the trial court properly denied Mr. Bertram's motion for a mistrial.

*Cumulative Error.* Mr. Bertram finally voices a number of complaints about his trial that he claims amount to cumulative error requiring reversal. "The cumulative error doctrine applies when several trial errors occurred and none alone warrants reversal but the combined errors effectively denied the defendant a fair trial." *State v. Jackson*, 150 Wn. App. 877, 889, 209 P.3d 553 (2009).

We have identified only one harmless error in reviewing the contentions set forth above: the juror misconduct in speaking with the bailiff. Mr. Bertram's SAG fails to sufficiently identify any other asserted error for review. RAP 10.10(c) (although a defendant is not required to cite to the record in a SAG, he must inform the court of the "nature and occurrence of the alleged errors"). Mr. Bertram received a fair trial.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, C.J.

WE CONCUR:

Korsmo, J.

Fearing, J.