IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 75924-8-I |
| Respondent/ | ) | |
| Cross-Appellant, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN ALAN WHITAKER, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant/ | ) | FILED: November 5, 2018 |
| Cross-Respondent. | ) | |

SMITH, J. — John Whitaker appeals his conviction for aggravated first degree murder and conspiracy to commit murder for his role in the murder of Rachel Burkheimer. He alleges numerous errors and constitutional violations, none of which require reversal. We affirm.

FACTS

In 2004, a jury found John Whitaker guilty of aggravated first degree murder and conspiracy to commit murder for his involvement in the death of Rachel Burkheimer, which occurred in September 2002. This court affirmed his conviction on appeal. See State v. Whitaker, 133 Wn. App. 199, 135 P.3d 923 (2006). But that conviction was reversed in 2013 when this court granted Whitaker's personal restraint petition because his right to a public trial was violated when six jurors were individually questioned in a closed courtroom

during voir dire. In re Pers. Restraint of Whitaker, No. 61980-2-I (Wash. Ct. App. June 17, 2013) (unpublished), http://www.courts.wa.gov/opinions/pdf/619802.pdf.

On remand in 2015, the State charged Whitaker with the same offenses. As in Whitaker's first trial, the State presented evidence that Whitaker helped his friend John Anderson and several others kidnap and kill Burkheimer, who was Anderson's ex-girlfriend. Whitaker helped to bind, hide, and transport Burkheimer. He helped to dig her grave, rob her, bury her, and destroy evidence of her murder. Although Whitaker testified in his first trial, he did not testify on retrial. With the exception of Whitaker's testimony, the evidence presented by the State in the first trial was similar to that presented on retrial and is not repeated here.

The jury found Whitaker guilty of premeditated first degree murder, with an aggravating factor of kidnapping and a firearm enhancement, and conspiracy to commit first degree murder. During the trial, Whitaker moved for a mistrial several times, alleging prosecutorial misconduct, a violation of CrR 6.15, and a violation of his right to a unanimous jury. After trial, Whitaker moved for a new trial based on these issues and other newly identified issues. The trial court denied his motion and sentenced him to life without the possibility of parole on the first degree murder charge (plus 60 months for the firearm enhancement) and 240 months on the conspiracy charge. Whitaker appeals.

## DURESS AS A DEFENSE TO AGGRAVATING FACTORS

Whitaker argues that the trial court erred when it refused to instruct the jury that duress is a defense to the aggravating factors of robbery and kidnapping. We disagree.

Jury instructions are sufficient if they permit each party to argue their theory of the case, do not mislead the jury, and, when read as a whole, properly inform the jury of the applicable law. Cox v. Spangler, 141 Wn.2d 431, 442, 5 P.3d 1265, 22 P.3d 791 (2000). A trial court's decision whether to give a particular instruction to the jury is a matter that we review for abuse of discretion. Stiley v. Block, 130 Wn.2d 486, 498, 925 P.2d 194 (1996). Refusal to give a particular instruction is an abuse of discretion only if the decision was "manifestly unreasonable, or [the court's] discretion was exercised on untenable grounds, or for untenable reasons." Boeing Co. v. Harker-Lott, 93 Wn. App. 181, 186, 968 P.2d 14 (1998).

Under RCW 9A.32.030(1)(a), a defendant is guilty of first degree murder when, "[w]ith a premeditated intent to cause the death of another person, he or she causes the death of such person." If a defendant is charged with first degree murder under RCW 9A.32.030(1)(a), the aggravating factors in RCW 10.95.020 can increase the penalty for that offense. State v. Kincaid, 103 Wn.2d 304, 307, 692 P.2d 823 (1985) ("The statutory aggravating circumstances which, when present, raise premeditated first degree murder to aggravated first degree · murder punishable by mandatory life imprisonment or death, are 'aggravation of

3

penalty' factors which enhance the penalty for the offense, and are not elements of a crime as such."). According to RCW 10.95.020,

> [a] person is guilty of aggravated first degree murder, a class A felony, if he or she commits first degree murder as defined by RCW 9A.32.030(1)(a) . . . and one or more of the following aggravating circumstances exist:
>
> . . . .
>
> (11) The murder was committed in the course of, in furtherance of, or in immediate flight from one of the following crimes:
> (a) Robbery in the first or second degree;
> (b) Rape in the first or second degree;
> (c) Burglary in the first or second degree or residential burglary;
> (d) Kidnapping in the first degree; or
> (e) Arson in the first degree[.]

Here, Whitaker was charged with first degree premeditated murder under RCW 9A.32.030(1)(a). Whitaker acknowledges that duress is not a defense to murder, but he argues that because RCW 9A.16.060 does not explicitly prohibit the use of a duress defense for aggravating factors, duress can be applied against the aggravating factors in RCW 10.95.020.

"The duress defense derives from the common law and is premised on the notion that it is excusable for someone to break the law if he or she is compelled to do so by threat of imminent death or serious bodily injury." State v. Mannering, 150 Wn.2d 277, 281, 75 P.3d 961 (2003) (citing ROLLIN M. PERKINS & RONALD N. BOYCE, CRIMINAL LAW 1059 (3d ed. 1982)). "Faced with danger to his or another's safety, the defendant is excused for choosing the lesser evil of perpetrating a crime, unless the crime involves killing an innocent person, which is never the lesser of two evils." State v. Harvill, 169 Wn.2d 254, 262, 234 P.3d 1166 (2010). RCW 9A.16.060 defines duress and states that

4

(1) In any prosecution for a crime, it is a defense that:
    (a) The actor participated in the crime under compulsion by another who by threat or use of force created an apprehension in the mind of the actor that in case of refusal he or she or another would be liable to immediate death or immediate grievous bodily injury; and
    (b) That such apprehension was reasonable upon the part of the actor; and
    (c) That the actor would not have participated in the crime except for the duress involved.
    (2) The defense of duress is not available if the crime charged is murder, manslaughter, or homicide by abuse.
    (3) The defense of duress is not available if the actor intentionally or recklessly places himself or herself in a situation in which it is probable that he or she will be subject to duress.
    (4) The defense of duress is not established solely by a showing that a married person acted on the command of his or her spouse.

Statutory interpretation is an issue of law that we determine de novo. Mannering, 150 Wn.2d at 282.

According to the plain language of the statute, duress may be a defense in the "prosecution for *a* crime." RCW 9A.16.060(1) (emphasis added.) The statute then goes on to explain the elements that must be met for duress to apply where a defendant participated in "*the* crime." RCW 9A.16.060(1)(a), (c). Under the plain language of the statute, the crime the defendant participated in, and for which the defense can be applied, must be the same crime for which the defendant is being prosecuted.

Here, Whitaker was prosecuted for first degree murder. He was not prosecuted for kidnapping or robbery—those were only alleged as aggravating factors to premeditated murder and do not establish a separate crime. Therefore, under the plain language of the statute, the defense of duress cannot be applied to those unprosecuted crimes alleged as aggravating factors. If the

5

State charged Whitaker with kidnapping or robbery, he would have been entitled to a duress defense on those prosecuted crimes. But because that was not the case, the trial court did not abuse its discretion in denying Whitaker a duress instruction on the aggravating factors of kidnapping and burglary.

Whitaker relies on two out-of-state cases, State v. Getsy, 84 Ohio St. 3d 180, 702 N.E.2d 866 (1998), and State v. Bockorny, 124 Or. App. 585, 863 P.2d 1296 (1993), but neither leads us to reversal. In Getsy, the Supreme Court of Ohio considered whether duress could be a defense to felony murder, the underlying felony, or the "capital specifications," which included an aggravating factor of murder for hire. Getsy, 84 Ohio St. 3d at 198-99. The court held that duress is not a defense to felony murder and that there was insufficient evidence to support the use of the defense for the underlying felony or the capital specifications. Id. at 199. It stated, "Arguably, the defense of duress could have been asserted for the aggravating circumstance of murder for hire, but the evidence presented by the state, if believed, indicated that Getsy was the only one of the three who wanted the money." Id. The court did not explain why duress is "arguably" a defense for an aggravating factor. Because RCW 9A.16.060 indicates that the defense of duress must be applied to the crime prosecuted, Getsy is not persuasive.

In Bockorny, the defendant was charged with aggravated murder under Oregon Revised Statute (ORS) 163.115(1)(b), which is similar to first degree felony murder in Washington. 124 Or. App. at 587. There, the issue was whether duress was available as a defense to the crimes underlying the felony

6

murder charge. Id. at 588. The court did not address the applicability of duress to aggravating factors. As such, Bockorny is not persuasive.

Finally, Whitaker argues that there was sufficient evidence of duress presented to provide a basis for a duress defense on the aggravating factors. We agree that there was evidence that Anderson threatened and used force against Whitaker and others as the events of Burkheimer's murder evolved. But the analysis does not end there. Because duress is not a defense to first degree murder, the trial court did not err in refusing to instruct the jury on duress.

## PROSECUTORIAL MISCONDUCT

Whitaker argues that the prosecutor committed reversible misconduct when he told the jurors that duress is not a defense to murder and defined duress for them, and again when he invited the jurors to imagine what Burkheimer was thinking and feeling in the hours before her murder. We agree that both statements constitute misconduct but hold that Whitaker waived any claim of prosecutorial misconduct because he failed to object.

"To prevail on a claim of prosecutorial misconduct, the defendant must establish 'that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.'" State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011) (internal quotation marks omitted) (quoting State v. Magers, 164 Wn.2d 174, 191, 189 P.3d 126 (2008)). If the defendant did not object, he is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. State v. Emery, 174 Wn.2d 741,

760-61, 278 P.3d 653 (2012) (citing State v. Stenson, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997)). "Under this heightened standard, the defendant must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" Id. at 761 (quoting Thorgerson, 172 Wn.2d at 455).

Where the defendant moves for a mistrial based on alleged prosecutorial misconduct, we will give deference to the trial court's ruling on the matter. Stenson, 132 Wn.2d at 719. "'The trial court is in the best position to most effectively determine if prosecutorial misconduct prejudiced a defendant's right to a fair trial.'" Id. (internal quotation marks omitted) (quoting State v. Luvene, 127 Wn.2d 690, 701, 903 P.2d 960 (1995)).

*Speculation as to the Victim's Thoughts and Feelings*

Whitaker argues that prosecutorial misconduct occurred during closing argument when the prosecutor asked the jury multiple times to imagine what Burkheimer was thinking and feeling in the hours leading up to her death. We agree but hold that the comments were not so flagrant and ill intentioned that they could not have been cured by an instruction to the jury.

Statements that do no more than appeal to the passion or prejudice of the jury are improper. State v. Pierce, 169 Wn. App. 533, 552, 280 P.3d 1158 (2012) (quoting State v. Gregory, 158 Wn.2d 759, 808, 147 P.3d 1201 (2006), overruled on other grounds by State v. W.R., 181 Wn.2d 757, 336 P.3d 1134 (2014)). It is reversible error for a prosecutor to urge a jury to decide a case based on evidence outside the record. Id. at 553. Prosecutors often use matters outside

the record to appeal to a jury's passion. Thus, these two rules are closely related. Id.

In Pierce, the defendant challenged three of the prosecutor's statements as appealing to the jury's passion and prejudice and arguing facts outside the evidence: (1) the prosecutor's first person narrative of what the defendant must have been thinking leading up to the crimes, (2) the prosecutor's fabricated description of the murders, and (3) the prosecutor's argument that the victims could not have imagined they would be murdered in their own home. Id. at 553. The defendant did not object to the last claimed error and had to show that the error was so prejudicial it could not have been cured by an instruction. Id. The Court of Appeals held that the argument was an improper appeal to passion and prejudice and served no purpose but to appeal to the jury's sympathy. Id. at 555. "That the Yarrs would never have expected the crime to occur was not relevant to Pierce's guilt, nor were the prosecutor's assertions about the Yarrs' future plans. Moreover, the argument invited the jury to imagine themselves in the Yarrs' shoes, increasing the prejudice." Id. at 555. The court further held that "[i]n the context of the entire argument," the defendant met his burden to show that the error could not have been cured by an instruction to the jury:

> Because the prosecutor focused on how shocking and unexpected
> the crimes were and invited the jury to imagine themselves in the
> position of being murdered in their own homes, in conjunction with
> the prosecutor's other improper and highly inflammatory arguments
> this argument engendered an incurable prejudice in the minds of
> the jury.

Id. at 556. The court concluded that, taking all the improper arguments together, there was more than a substantial likelihood that they affected the verdict. Id.

During closing argument in this case, the prosecutor invited the jury to imagine what Burkheimer was thinking and feeling:

> And with all the pain that Rachel felt that night in the last hours of her life, right there, amongst the emotions that she must have been feeling, must have been the pain, knowing that these were not strangers doing this to her; these were the people that she had laughed with, the people she had eaten with, the people that she had danced with, the people who had tickled her, played with her in the hours before she's attacked. *Imagine that.*

Report of Proceedings (RP) at 2664 (emphasis added).

Later, the prosecutor said, "*Imagine* what Rachel went through in the hours that she is in that garage." Id. at 2673 (emphasis added). He then expanded on this argument:

> *Imagine what Rachel is going through all that time*, in the garage at that residence, hearing the voices of the people she called friends, talking about her, talking about ransom, selling her back to her family. Does your father love you? Does your family love you? Will they pay money for you? She's nodding her head, according to Tony Williams and Matt Durham.
>
> At this point she must have believed her family would do anything for her. She stays there, surrounded by stuffed animals, bound, hands and feet behind her on the rug in between couches, while her friends come in and out of that garage. *What is she thinking?* When she hears Kevin Jihad come in and say that bitch may have my DNA [(deoxyribonucleic acid)] under her nails, clean out her nails, and John Anderson cleans underneath Rachel's nails. *What is she thinking?*
>
> *What is she thinking when she hears him chamber a round*, Kevin Jihad, and says we should just end this right here. Pointing the gun several feet away from her. *Imagine the infliction of mental anguish.* She doesn't know whether that gun is going off at that point. *What is she thinking?*
>
> When Jeff Barth comes into that garage while she lays down there, and I always asked the witnesses, if you will recall, was she conscious? Could she hear? Did it appear to you that she could hear what's going on?
>
> When he waves his gun in front of him by his groin, pretending it to be a penis, and is laughing, and walks over to where she's lying on the ground, and pokes her in the buttocks

while he says we should all stick her -- *what is she thinking? What is she feeling?*

Id. at 2674-75 (emphasis added). There are two additional times the prosecutor asked aloud what Burkheimer was thinking at the time. Id. at 2675, 2679.

Later, the prosecutor speculated what Burkheimer was thinking. He states that "[s]he is resigned to her fate. She knows she is going to die," and "she knows she's going to die. At the hands of her friends." Id. at 2686. Again, he explains, "She is resigned to her fate. With everything she has heard in the garage, with everything that she has heard in the car, with begging Maurice Rivas, her friend, to let her go, and she's not released, she knows she's going to die." Id. at 2689. Whitaker did not object to any of these statements.

The prosecutor's invitation to the jury to imagine what Burkheimer was thinking and telling them that she knew she was going to die are very similar to the improper comments in Pierce. These statements were not relevant to the elements of the crime in deciding Whitaker's guilt and only served to appeal to the jury's sympathy by asking the jurors to put themselves in Burkheimer's shoes. We agree with Whitaker that these statements constitute prosecutorial misconduct.

We disagree with the State's assertion that the prosecutor's arguments were not an appeal to the jurors' sympathy, but rather "an invitation for jurors to draw their own reasonable inferences from the evidence." Br. of Resp't at 40. Although each of the improper statements was related to testimony given in the case, injecting Burkheimer's perspective was improper and irrelevant to Whitaker's guilt. Contrary to the State's contention at oral argument,

11

Burkheimer's thoughts were not relevant to Whitaker's intent or to the element of extreme emotional distress for the aggravating factor of kidnapping. The prosecutor should have limited his arguments to what the testifying witness observed. It was unnecessary and inappropriate for him to extend the argument to Burkheimer's thoughts. Additionally, to the extent that the arguments invited the jurors to imagine Burkheimer's reactions to the crime as it was unfolding, they were embellishments on the evidence presented at trial because neither Burkheimer nor anyone else could testify to those thoughts. These arguments were clearly improper and prejudicial.

Nonetheless, we conclude that Whitaker waived the error by failing to object. Unlike statements in other reversible instances of prosecutorial misconduct that invoked racial prejudice or presented altered versions of admitted evidence, the statements here were not so flagrant and ill intentioned that they could not have been cured with an objection. See State v. Belgarde, 110 Wn.2d 504, 755 P.2d 174 (1988) (reversible error where the prosecutor stated that the defendant was associated with an organization of madmen that kill indiscriminately); State v. Monday, 171 Wn.2d 667, 257 P.3d 551 (2011) (reversible error where the prosecutor imputed an "anti-snitch" code to black witnesses only); In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 286 P.3d 673 (2012) (reversible error where the prosecutor altered the defendant's booking photograph with the addition of phrases, such as "'GUILTY'" superimposed three times in an "X" shape over defendant's face in red letters); State v. Walker, 182 Wn.2d 463, 341 P.3d 976 (2015) (reversible error where the

prosecutor presented PowerPoint slides showing admitted exhibits altered with inflammatory text that expressed a personal opinion on defendant's guilt). Here, reversal is not mandated by the case law.

*Prosecutor's Statements on Duress*

Whitaker also argues that the prosecutor committed misconduct during the rebuttal portion of his closing argument when he told the jury that duress was not a defense to murder. We agree but again hold that the comments were not so flagrant and ill intentioned that they could not have been cured by an instruction.

In State v. Davenport, 100 Wn.2d 757, 675 P.2d 1213 (1984), the Supreme Court held that a similar statement was prosecutorial misconduct. There, the defendant was charged with second degree burglary. Id. at 758. The State did not present direct evidence proving that the defendant had been inside the burglarized residence and did not request an accomplice liability instruction. Id. Defense counsel argued in closing that there was only evidence that the defendant had received stolen property outside the residence and that this was insufficient to prove that he was guilty of burglary. Id. at 758-59. In rebuttal, the prosecutor stated, "'[I]t doesn't make any difference actually who went into the house . . . they are accomplices.'" Id. at 759 (second alteration in original). The court overruled the defendant's objection. Id.

After deliberating for over two hours, the jury sent a note to the trial judge, requesting a definition of "accomplice" and asking whether the defendant had to physically enter and remove the identified items. Id. The court directed the jury

to "'rely on the law given in the Court's instructions to the jury.'" Id. The jury found the defendant guilty. Id.

The Supreme Court concluded that the jury's question to the trial court established "not only that during deliberations the jury was considering the prosecutor's improper comment, but also, that the jury considered the statement to be a proper statement of law." Id. at 764. Further, the trial court's response could not fairly be called a curative instruction. Id. at 764. Because the jury was influenced and possibly misled by the prosecutor's comment, the court was unable to conclude that the trial was fair. Id.

Here, during Whitaker's closing argument, defense counsel explained his theory of the case: that Whitaker did not form the intent necessary for the conspiracy charge because he was not following a plan to kill Burkheimer. Rather, Whitaker was afraid of Anderson and was reacting to Anderson rather than participating in a preconceived plan. Whitaker did not explicitly argue that he participated in Burkheimer's murder out of fear of Anderson. But, the prosecutor then opened his rebuttal argument as follows:

> Thank you. Ladies and gentlemen of the jury, you have heard remarks from Counsel and argument on the fact that John Whitaker and all these individuals were just afraid that night. They were just afraid. They did all they did just because they were afraid. They were scared that John Anderson would have done something to them.
> *Being afraid is not a defense to the crime of murder in the state of Washington. You can check that packet of instructions you have from top to bottom. You won't see it there. Because in the state of Washington duress is not a defense to murder. If it was, Judge Krese, wearing the black robe, she's been doing this for years, she would have given you that instruction. It is not a defense. And rightfully so. Because why should one person place*

*the value of a life more value than the life of another person? It's not a defense.*

I told you the evidence doesn't suggest that Whitaker was afraid. Clearly not. Because he calls back to the house, and is pissed, and he tells him, tells Anderson, you come clean up your mess. That's not someone who's afraid. And when John Anderson tells him to go strike Rachel, and he doesn't do that, he doesn't get shot or anything. He tells him, I'm not doing it. That's not someone who is afraid. The evidence doesn't support fear.

Maurice Rivas, he was someone who had disregarded Diggy. Everything that you hear about John Anderson being this individual who was volatile, extremely violent, crazy, he didn't just become this on September 23rd; he was always this way. But then who was his roommate? Who was his friend? Who was the person that you heard testimony, if you saw him, you saw John Anderson? It was Whitaker. So there's no fear, because even if there was, it's not a defense to the crime of murder in the state of Washington.

Id. at 2764-66 (emphasis added). Whitaker did not object.

Here, as in Davenport, the prosecutor's comment that duress is not a defense to murder was improper and prejudicial for several reasons. First, the prosecutor knew that the trial court had already refused to instruct the jury on duress on the aggravating factors, as requested by Whitaker, and ignored that fact and chose to bring up the legal theory anyway. Second, in closing, defense counsel did not argue that Whitaker should be acquitted because he killed Burkheimer out of fear of Anderson, as the prosecutor implied. Rather, he argued that Whitaker did not form the intent necessary for the conspiracy charge because he was acting out of fear of Anderson, not as part of a plan. The prosecutor's mischaracterization of the defense argument at the beginning of his rebuttal argument gave it greater emphasis. Finally, it is clear from the record that the argument prejudiced Whitaker because, as in Davenport, the jury submitted the following question:

> The prosecutor said that "being afraid or being under duress" is not a defense in the state of WA. We need clarification on if that is indeed the "Law" in WASH.

Clerk's Papers (CP) at 512. The trial court responded, "Please refer to the instructions you have already received, in particular, Instruction No. 1." Id.

However, because Whitaker did not object to the improper argument, he must show that it could not have been cured by an instruction to the jury. He cannot do so. Whitaker raised this issue in his motion for a mistrial. The trial court held that the comment was not so prejudicial that it could not have been cured, explaining, "If the objection had been made, the court could have stricken the comments and directed the jury to disregard them when the argument was first made." Id. at 93. The jury's question to the trial court indicates that they were looking for an instruction on this issue and an instruction could have cured the prejudice. The court did not abuse its discretion by denying a mistrial on this basis.

Whitaker argues that the misconduct could not have been cured because it was clearly intentional rather than inadvertent given the experience of the prosecutor. But even if it was intentional, it could have been cured had Whitaker timely objected.

Even so, we admonish the prosecutor's intentional use of the improper arguments described above. "In presenting a criminal case to the jury, it is incumbent upon a public prosecutor, as a quasi-judicial officer, to seek a verdict free of prejudice and based upon reason." State v. Charlton, 90 Wn.2d 657, 664, 585 P.2d 142 (1978). As our courts have stated many times, "[T]he prosecutor,

in the interest of justice, must act impartially, and his trial behavior must be worthy of the position he holds." Id. The arguments described above were clearly improper based on well established case law. The State has a responsibility to put a stop to such conduct and must "demand careful and dignified conduct from its representatives in court." State v. Neidigh, 78 Wn. App. 71, 79, 895 P.2d 423 (1995).

## VIOLATION OF CrR 6.15

Whitaker argues that the trial court violated CrR 6.15 when juror 2 communicated safety concerns to the bailiff and was separated from the other jurors. We disagree.

Generally, the trial judge and the bailiff should not communicate with the jury in the absence of the defendant. State v. Bourgeois, 133 Wn.2d 389, 407, 945 P.2d 1120 (1997). "[I]mproper communication between the court and the jury is an error of constitutional dimensions." Id. CrR 6.15(f)(1) states that "[t]he jury shall be instructed that any question it wishes to ask the court *about the instructions or evidence* should be signed, dated and submitted in writing to the bailiff." (Emphasis added.) RCW 4.44.300 also defines the scope of prohibited communication between a bailiff and a jury during deliberations. This statute provides that the bailiff shall not communicate with the jury during deliberations, except to ask if they have reached a verdict. "[T]his does not preclude innocuous or neutral statements" and "forbids only communications that could possibly influence deliberations." State v. Yonker, 133 Wn. App. 627, 635-36, 137 P.3d 888 (2006). "Communications necessary for the proper care of the jury, such as

17

lunch orders and other administrative matters, do not raise an inference of impropriety because these communications are neutral and innocuous." Id. at 636 (citing State v. Johnson, 125 Wn. App. 443, 460, 105 P.3d 85 (2005); State v. Forsyth, 13 Wn. App. 133, 137, 533 P.2d 847 (1975)). Bailiff statements that do not "define or explain an instruction" or "inform the jury on a point of law" are not prejudicial. State v. Russell, 25 Wn. App. 933, 948, 611 P.2d 1320 (1980). Improper and prejudicial communications between a bailiff and a jury include a bailiff's inquiry as to how deliberations were proceeding and suggestions for making the process run more smoothly, "comments about the effects of a failure to agree and the impracticability of reconvening court to consider further instructions," and statements that "hasten the jury's verdict." Johnson, 125 Wn. App. at 461; State v. Christensen, 17 Wn. App. 922, 925, 567 P.2d 654 (1977); State v. Crowell, 92 Wn.2d 143, 148, 594 P.2d 905 (1979).

"This court applies an abuse of discretion standard in reviewing the trial court's denial of a mistrial." State v. Rodriguez, 146 Wn.2d 260, 269, 45 P.3d 541 (2002) (citing State v. Hopson, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989)). "A reviewing court will find abuse of discretion only when 'no reasonable judge would have reached the same conclusion.'" Id. at 269 (internal quotation marks omitted) (quoting Hopson, 113 Wn.2d at 284). "A trial court's denial of a motion for mistrial will only be overturned when there is a 'substantial likelihood' that the error prompting the request for a mistrial affected the jury's verdict." Id. at 269-70 (internal quotation marks omitted) (quoting State v. Russell, 125 Wn.2d 24, 85, 882 P.2d 747 (1994)).

18

Here, the trial court entered the following findings of fact on this issue:

26. On June 28, 2016, the jury buzzed the law clerk for help.
27. The bailiff/law clerk responded to the jury buzzer to ask what they needed. There is no evidence that the bailiff/law clerk asked any questions other than to ascertain why the juror had buzzed and what his difficulty was.
28. Juror No. 2 said he needed to be excused and began leaving the jury room, so the law clerk had him go to a separate conference room.
29. Contrary to the assertion by the defendant that the bailiff separated Juror No. 2, the record supports the conclusion that Juror No. 2 essentially separated himself and refused to rejoin the jury.
30. The law clerk made no further effort to inquire about the circumstances of the need to leave the jury room. He directed Juror No. 2 not to tell him anything about the deliberations.
31. The law clerk provided no information about the case and no advice to Juror No. 2.
32. Juror No. 2 persisted in trying to reveal details of the jury's deliberations to the law clerk despite the court's instructions to the jury not to discuss the case with anyone other than their fellow jurors.
33. As soon as the bailiff ascertained the nature of Juror No. 2's complaint, he immediately notified the court and counsel.

CP at 1730-31.

Although Whitaker challenges findings 29 through 33, they are supported by substantial evidence. State v. P.E.T., 185 Wn. App. 891, 901, 344 P.3d 689 (2015) ("We uphold findings of fact if they are supported by substantial evidence. 'Substantial evidence' is evidence sufficient to persuade a fair-minded, rational person of the truth of the finding.") (citation omitted). According to the bailiff's testimony, juror 2 summoned the bailiff during deliberations and stated that he needed to be excused. The bailiff took juror 2 into a conference room so that he "could have a discussion away from the other jurors so [he] could know what [juror 2's] concern was." RP at 2825. The bailiff explained that juror 2

19

was concerned that the defendant would not get a fair trial. Also, he said that he felt that everyone was ganging up on him, and that the rest of the jury was very friendly and was having lunches and exchanging phone numbers, and trying to -- he said something about one of them trying to sell his electronic business or something to other ones. And he seemed incredibly frustrated and flustered, and said, "I can't do this anymore," you know. And that was -- and that was sort of the tenor of it.

And whenever he would try to get into specifics about the case I said, "Don't tell me about that, let me interrupt, let me talk to the judge," and so then I had him stay there while I brought this to the Court's attention.

Id. at 2825-26. The bailiff did not tell the juror to write a note that could be relayed to the judge.

Whitaker moved for a mistrial, arguing that the bailiff's interactions with juror 2 violated CrR 6.15(f)(1).[1] This issue was also raised in his motion for a new trial. The trial court held that a new trial was not necessary based on CrR 6.15(f)(1) because "Juror No. 2's demand to be excused from the jury was not a jury question regarding instructions or evidence." CP at 95.

The trial court did not abuse its discretion. Juror 2 did not express a question about the instructions or the evidence in the case, and the bailiff's response was not improper because it did not define or explain an instruction or inform the jury on a point of law. The bailiff's response that juror 2 should not tell him about deliberations and that he would notify the court of juror 2's request to be excused is more properly described as a communication "necessary for the

---

[1] In its cross appeal, the State argues that Whitaker waived his right to assert this issue because he asked the trial court to reserve ruling on his motion for a mistrial until after the jury rendered its verdict. We choose to reach the merits of Whitaker's claim and do not address the State's argument of waiver.

proper care of the jury . . . [that was] neutral and innocuous." Yonker, 133 Wn. App. at 636 (citing Johnson, 125 Wn. App. at 460; Forsyth, 13 Wn. App. at 137).

Whitaker argues that it is impossible to know what went on between juror 2 and the bailiff. But there is testimony from the bailiff, which is included above, and the only communication described in juror 2's declaration from the bailiff to juror 2 was that the bailiff told juror 2 he could not give him legal advice. These communications were not improper, and there is no evidence that they violated CrR 6.15.

THE RIGHT TO BE PRESENT AND THE RIGHT TO AN OPEN TRIAL

Whitaker argues that the bailiff's communications with juror 2 also violated his state and federal constitutional rights to be present and to an open and public trial. We disagree.

Under the Sixth Amendment and article I, section 22 of the Washington State Constitution, a criminal defendant has the right to attend his trial. State v. Rice, 110 Wn.2d 577, 616, 757 P.2d 889 (1988) (citing Snyder v. Mass., 291 U.S. 97, 105-08, 54 S. Ct. 330, 78 L. Ed. 674 (1934), overruled in part on other grounds sub nom. Malloy v. Hogan, 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964)). This right entitles a defendant to be present at every stage of his trial where his presence has a reasonably substantial relationship to the fullness of his opportunity to defend himself. Id. (citing Snyder, 291 U.S. at 105-06).

Article I, section 22 also states that "[i]n criminal prosecutions the accused shall have the right . . . to have a speedy public trial." The Sixth Amendment includes a similar provision. State v. Tinh Trinh Lam, 161 Wn. App. 299, 303,

21

254 P.3d 891 (2011), <u>review dismissed</u>, 176 Wn.2d 1031, 299 P.3d 20 (2013). "These provisions assure a fair trial, foster public understanding and trust in the judicial system, and provide judges with the check of public scrutiny." <u>Id.</u> at 303 (citing <u>State v. Duckett</u>, 141 Wn. App. 797, 803, 173 P.3d 948 (2007)). "While the public trial right is not absolute, Washington courts strictly guard it to assure that proceedings occur outside the public courtroom in only the most unusual circumstances." <u>Id.</u> (citing <u>State v. Easterling</u>, 157 Wn.2d 167, 174-75, 137 P.3d 825 (2006); <u>State v. Brightman</u>, 155 Wn.2d 506, 514-15, 122 P.3d 150 (2005); <u>In re Pers. Restraint of Orange</u>, 152 Wn.2d 795, 804-05, 100 P.3d 291 (2004); <u>State v. Bone-Club</u>, 128 Wn.2d 254, 258-59, 906 P.2d 325 (1995)). To protect the defendant's right to a public trial, a trial court must apply and weigh five factors before restricting public access to a portion of a criminal trial. <u>Id.</u> If the record indicates a violation of a defendant's public trial right, prejudice is presumed and the conviction should be reversed and remanded for a new trial. <u>Id.</u> at 304 (citing <u>Easterling</u>, 157 Wn.2d at 174).

In <u>Lam</u>, a juror expressed safety concerns to the bailiff. 161 Wn. App. at 302. This court held that the defendant's right to a public trial was violated when the judge, defense counsel, and the prosecutor questioned the juror about these concerns in chambers without conducting the proper analysis. <u>Id.</u> at 305. The defendant did not allege a violation of the right to public trial based on the bailiff's first contact with the juror.

Here, Whitaker moved for a new trial, arguing that both his right to an open and public trial and his right to be present were violated by the bailiff's

interactions with juror 2. The trial court denied his motion, finding that "[t]here is no reasonable way it could have been handled in open court initially," and unlike Lam, no questioning of juror 2 occurred in closed session. CP at 97.

The trial court did not abuse its discretion. Here, unlike in Lam, the court discussed juror 2's safety concerns in open court, in the presence of the defendant. The only communication that occurred in private was juror 2's initial contact with the bailiff. But these communications were not improper and the bailiff notified the trial court without delay. Whitaker cites no authority under which the bailiff was constitutionally required to take a different action when juror 2 requested to be excused and attempted to tell the bailiff what was occurring in deliberations. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (argument not supported by citation to legal authority need not be considered). Whitaker's constitutional rights were not violated.

RIGHT TO DUE PROCESS AND A UNANIMOUS AND IMPARTIAL JURY

Whitaker argues that the trial court's dismissal of juror 2 was related to that juror's views on the merits of the case and violated Whitaker's right to due process and a unanimous and impartial jury. We disagree.

A discharge stemming from a juror's doubts about the sufficiency of the evidence violates the right to a unanimous jury verdict because it enables the State to obtain a conviction even though a member of the jury who began deliberations thought that the State failed to prove its case. State v. Elmore, 155 Wn.2d 758, 771, 123 P.3d 72 (2005) (citing Sanders v. Lamarque, 357 F.3d 943, 945 (9th Cir. 2004)). "Dismissal of a holdout juror also risks violating the Sixth

Amendment right to an impartial jury." Id. at 772 (citing U.S. CONST. amend. VI; see also WASH. CONST. art. I, § 22). "[W]here a deliberating juror is accused of refusing to follow the law, that juror cannot be dismissed when there is any reasonable possibility that his or her views stem from an evaluation of the sufficiency of the evidence." Id. at 778. "[O]nce the proper evidentiary standard is applied, the trial court's evaluation of the facts is reviewable only for abuse of discretion." Id.

In Elmore, two jurors accused juror 8 of refusing to follow the court's instructions. Id. at 763. After interviewing the complaining jurors and conducting a hearing with counsel about whether or not to dismiss juror 8, the trial court agreed to interview juror 8. Id. at 763-64. Juror 8 explained his view "'that it does not matter what [the instructions] says, it matters if we believe . . . the witnesses are credible.'" Id. at 765 (quoting RP at 1183). On this basis, without interviewing any other jurors, the trial court found that juror 8 "manifested unfitness by reason of bias or prejudice with respect to the instructions on the law as a whole in this matter" and disqualified him. Id. (quoting RP at 1185-86). After juror 8 was replaced by an alternate juror and deliberations began anew, the reconstituted jury found Elmore guilty. Id. at 766. On appeal, the Supreme Court acknowledged that there was evidence that juror 8 was participating in deliberations but disagreed with the other jurors about the witnesses' credibility. Id. at 778-79. It then reversed the convictions, holding that

> [w]here there is conflicting evidence as to the reasoning behind a
> juror's position, the heightened standard requires the trial court to
> err on the side of allowing the juror to continue to deliberate if there

24

is *any reasonable possibility* that the juror's views are based on the sufficiency of the evidence.

Id. at 779. Reversal was necessary because the trial court did not apply this heightened evidentiary standard before removing juror 8. Id. at 780.

Here, Whitaker first moved for a mistrial when juror 2 was segregated from the other jurors, arguing that juror 2's segregation violated Whitaker's right to a unanimous jury verdict because it indicated to the other jurors that something was wrong with juror 2's point of view.[2] He renewed this claim in his motion for a new trial, after juror 2 was dismissed for medical reasons. The trial court denied the motion for a new trial, stating that "Juror No. 2 was not excused because he was a holdout juror but because he suffered a serious medical emergency that rendered him unable to deliberate." CP at 98.

The trial court did not abuse its discretion. Unlike the juror in Elmore, juror 2 was not dismissed because he refused to follow the court's instructions. He was dismissed because he suffered a heart attack and could not return.

Whitaker argues that juror 2 suffered a heart attack because of the stress of being the defense holdout juror and, therefore, his dismissal for health reasons was related to his views on the merits of the case. Juror 2's declaration stated that he was threatened by members of the jury and began having chest pains when "the pressure on me became too great." CP at 372-74. But there is no

---

[2] In its cross appeal, the State also argued that Whitaker waived his right to assert this issue by asking the trial court to reserve ruling on his motion for a mistrial. Again, we choose to reach the merits of Whitaker's claim and do not address the State's argument of waiver.

medical evidence in the record explaining the cause of juror 2's heart attack, and regardless of any connection between the stress of jury duty and his medical condition, the trial court's decision to excuse juror 2 was based on his medical issues, not his views on the case. Therefore, reversal is not warranted.

Whitaker also argues that "[a]ll of these issues could have been avoided" if the bailiff had originally "told the juror to put his request [to be excused] in writing so the judge could take up the matter with the parties." Br. of Appellant at 37. But it is unclear how keeping juror 2 in the jury room against his will could have prevented his medical condition or his inability to serve based on that condition. Therefore, this argument is not persuasive.

## JUROR MISCONDUCT

Whitaker argues that he is entitled to a new trial because one of the jurors decided Whitaker was guilty before deliberations and told other jurors "'I hope they fry the fucking bastard.'" CP at 1733. We disagree.

The Washington State Constitution provides that "[t]he right of trial by jury shall remain inviolate." WASH. CONST. art. I, § 21. "The right of trial by jury means a trial by an unbiased and unprejudiced jury, free of disqualifying jury misconduct." State v. Tigano, 63 Wn. App. 336, 341, 818 P.2d 1369 (1991). "A trial court may grant a new trial based on juror misconduct when it affirmatively appears that a substantial right of the defendant was materially affected." State v. Tandecki, 120 Wn. App. 303, 310, 84 P.3d 1262 (2004), aff'd, 153 Wn.2d 842, 109 P.3d 398 (2005).

> As a general rule, the trial courts have wide discretionary powers in conducting a trial and dealing with irregularities which

arise. A mistrial should be granted only when . . . the defendant has been so prejudiced that nothing short of a new trial can insure that defendant will be tried fairly.

State v. Gilcrist, 91 Wn.2d 603, 612, 590 P.2d 809 (1979) (citations omitted). Only errors that may have affected the outcome of the trial are prejudicial. Id.

An allegation that a jury has deliberated prematurely, without more, does not warrant a new trial. Tate v. Rommel, 3 Wn. App. 933, 937-38, 478 P.2d 242 (1970) ("[T]he mere revealing of an opinion, as to the ultimate outcome of a trial by an otherwise unbiased juror, before submission of the case to the jury, based upon evidence properly received, while not to be condoned, does not, standing alone, constitute such misconduct as to justify the granting of a new trial."). A party must show that the communication prejudiced the outcome of the trial. Tate, 3 Wn. App. at 938 (emphasis omitted). Otherwise,

[i]f every verdict were subject to impeachment if the losing side could obtain an affidavit indicating that in making up his or her mind, the juror reached certain critical conclusions prior to commencement of deliberations, disregarded some evidence, misunderstood an instruction, misapplied the rules of law, or completely misunderstood the testimony of one or more witnesses, then a jury verdict would simply be the first round in an interminably prolonged trial process.

State v. Hatley, 41 Wn. App. 789, 794, 706 P.2d 1083 (1985).

In Hatley, this court addressed whether a court may consider the point at which jurors made up their minds about guilt or innocence. Id. at 793. There, Hatley moved for a new trial after a juror's alleged misconduct came to light. Id. at 792. The trial court held an evidentiary hearing. Id. At the hearing, the juror admitted that he had talked to an acquaintance about the trial during the second week of the three-week trial. Id. He denied stating an opinion about Hatley's

27

guilt to that acquaintance but admitted that he made up his mind before the jury began to deliberate. Id. The trial court found that the juror made his final decision about Hatley's guilt before the jury deliberated and that this misconduct prejudiced Hatley's right to a fair trial. Id.

The Court of Appeals reversed, determining that the trial court improperly considered the juror's testimony as well as that of the juror's acquaintance, because the facts in the testimony were linked to the juror's motive, intent, or belief. Id. at 794. Such evidence of jurors' mental processes, including their expressed opinions and when they made up their minds, inheres in the verdict. Id. at 793-94. Additionally, the court noted that even if the juror made up his mind before deliberations began, this misconduct was not prejudicial. Id. at 794. It reasoned that if a new trial were required every time a juror revealed his private opinion during trial, it would open the door to widespread interrogation of jurors after trial. Id. at 795 (quoting Tate, 3 Wn. App. at 937).

Here, Whitaker moved for a new trial, alleging juror misconduct. The trial court held an evidentiary hearing and questioned the jurors. The court found that after the testimony of the medical examiner, but before deliberations began, one juror stated, "'I hope they fry the fucking bastard.'" CP at 1733. Seven of the fourteen jurors testified that they did not hear the statement, three stated that they heard a disparaging remark, and four testified that they heard the same or a substantially similar comment. The trial court denied Whitaker's motion, finding that there was no evidence that this statement prejudiced him.

28

The trial court did not abuse its discretion. Whitaker has not asserted that the jurors relied on any evidence outside the record, and any evidence of when the jury decided Whitaker's guilt inheres in the verdict and was properly not considered by the trial court. Hatley, 41 Wn. App. at 793-94. Therefore, Whitaker's right to an impartial jury was not violated.

Whitaker argues that the juror's comment indicates a failure to follow the trial court's instructions to keep an open mind, not be overcome by emotion, and not consider punishment. Even so, evidence of when the juror made up his or her mind or expressed his or her opinion to the rest of the jury is linked to that juror's motive, intent, or belief, and it inheres in the verdict. Id.

Whitaker further argues that Hatley and Tate are distinguishable because in those cases, the juror's comments of guilt were to someone outside of the jury rather than to the jury itself and the statement at issue here was much more inflammatory than the statements in those cases. Despite these factual differences, the analysis is the same. The juror's statement in this case inheres in the verdict, and Whitaker has not shown that the comment prejudiced him.

## AUTOPSY PHOTOGRAPHS

In this appeal, as in his last appeal, Whitaker argues that the autopsy photos admitted during the medical examiner's testimony were more prejudicial than probative and that the trial court abused its discretion in admitting them. We disagree.

"Accurate photographic representations are admissible, even if gruesome, if their probative value outweighs their prejudicial effect." Whitaker, 133 Wn.

29

App. at 227 (citing State v. Crenshaw, 98 Wn.2d 789, 806, 659 P.2d 488 (1983)). "A bloody, brutal crime cannot be explained to a jury in a lily-white manner." Id. (citing State v. Adams, 76 Wn.2d 650, 656, 458 P.2d 558 (1969), rev'd on other grounds, 403 U.S. 947, 91 S. Ct. 2273, 29 L. Ed. 2d 855 (1971)). That said, although the State may present "ample evidence" to prove every element of the crime, it does not have free reign to introduce every piece of admissible evidence when the cumulative effect of that evidence is inflammatory and unnecessary. Id. (quoting Crenshaw, 98 Wn.2d at 807); see also State v. Sargent, 40 Wn. App. 340, 698 P.2d 598 (1985) (Abuse of discretion to admit four autopsy photographs when only one showed premeditation and testimonial evidence and diagrams could have revealed the same information in a nonprejudicial manner.).

"The admission of autopsy photographs is in the sound discretion of the trial court." Whitaker, 133 Wn. App. at 227 (citing State v. Lord, 117 Wn.2d 829, 870, 822 P.2d 177 (1991), abrogated on other grounds by State v. Schierman, ___ Wn.2d ___, 415 P.3d 106 (2018)). "Photographs have probative value where they are used to illustrate or explain the testimony of the pathologist performing the autopsy." Id. (citing Lord, 117 Wn.2d at 870). "Unless it is clear from the record that the primary reason to admit gruesome photographs is to inflame the jury's passion, appellate courts will uphold the decision of the trial court." Id. "The law requires an exercise of restraint, not a preclusion simply because other less inflammatory testimonial evidence is available." Id. (citing State v. Stackhouse, 90 Wn. App. 344, 357, 957 P.2d 218 (1998)).

Here, the trial court admitted 15 autopsy photographs during the testimony of the medical examiner. The medical examiner testified that around 100 photographs were taken during Burkheimer's autopsy and that the 15 selected for trial showed the injuries to Burkheimer's body, what the medical examiner looked at when he decided where the bullet exit and entry wounds were, and how Burkheimer's injuries related to one another. His testimony explaining the photographs and his conclusions about Burkheimer's injuries was straightforward and not inflammatory.

During Whitaker's first appeal, he challenged the admission of the autopsy photographs on substantially the same basis. This court held that the trial court did not abuse its discretion in admitting the photographs because although the photographs were gruesome, it was reasonable to conclude that the "jurors would better understand the doctor's testimony with photographs than they would with diagrams." Id. at 229.

Whitaker argues that the issue is different in this appeal because he agreed not to question the validity of the medical examiner's testimony and, in fact, did not cross-examine the medical examiner. Even so, the trial court did not abuse its discretion in determining that the probative value of the photographs in helping to illustrate the medical examiner's testimony outweighed their prejudicial effect.

Whitaker also argues that the juror's comment after the medical examiner's testimony that "'I hope they fry the fucking bastard'" illustrates that the photos inflamed the jury. CP at 1733. There is no doubt that these photographs

are disturbing. But this was a brutal crime, and the record does not show that the primary reason for admitting the photographs was to inflame the jury. Rather, it establishes that the photographs were admitted to support the testimony of the medical examiner. The State did not offer all 100 of the photographs but instead selected 15 that best illustrated Burkheimer's injuries. Therefore, the trial court did not abuse its discretion by admitting them.

## TESTIMONY ON POSTARREST SILENCE

Whitaker argues that he is entitled to a new trial because the prosecutor elicited testimony that Whitaker exercised his right to remain silent. We disagree.

"The State may not use a defendant's constitutionally permitted silence as substantive evidence of guilt." State v. Romero, 113 Wn. App. 779, 787, 54 P.3d 1255 (2002) (citing State v. Lewis, 130 Wn.2d 700, 705, 927 P.2d 235 (1996); State v. Easter, 130 Wn.2d 228, 236, 922 P.2d 1285 (1996); State v. Curtis, 110 Wn. App. 6, 11-12, 37 P.3d 1274 (2002)). The right to silence is derived from the Fifth Amendment and article I, section 9 of the Washington State Constitution. Id. at 786 (citing Easter, 130 Wn.2d at 238). A defendant's constitutional right to silence applies both pre- and postarrest. Id. (citing Easter, 130 Wn.2d at 243). In the postarrest context, it is well settled that the State violates due process where it comments on a defendant's exercise of his right to remain silent. Id. at 786-87 (citing Doyle v. Ohio, 426 U.S. 610, 619, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976); State v. Fricks, 91 Wn.2d 391, 395-96, 588 P.2d 1328 (1979)). Thus, it is constitutional error for a police witness to testify that a defendant refused to speak to him and for the State to purposefully elicit testimony as to the

defendant's silence. Id. at 790 (citing Easter, 130 Wn.2d at 236, 241; Curtis, 110 Wn. App. at 13).

If the defendant's silence is the subject of a direct comment, a constitutional error exists and the reviewing court must decide if the error was harmless beyond a reasonable doubt.[3] Id. (citing Easter, 130 Wn.2d at 241-42). "'The State bears the burden of showing a constitutional error was harmless.'" Id. at 794 (quoting Easter, 130 Wn.2d at 242). A constitutional error is harmless if the court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result absent the error, and if the untainted evidence is so overwhelming it necessarily leads to a finding of guilt. Id. at 794-95 (citing Easter, 130 Wn.2d at 242; State v. Aumick, 126 Wn.2d 422, 430, 894 P.2d 1325 (1995); State v. Whelchel, 115 Wn.2d 708, 728, 801 P.2d 948 (1990)). Where an error is not harmless, the defendant must have a new trial. Id. at 795 (citing Easter, 130 Wn.2d at 242).

Here, Detective Brad Pince testified directly as to Whitaker's postarrest silence:

> Q. Prior to you having a conversation with [Whitaker], did you advise him of his rights?
>
> A. I did.
>
> Q. Did you advise him of his rights from memory or from some document?
>
> A. From a card I carry with me in my pocket.
>
> Q. Is that a card that you carry with you when you're working?

---

[3] A different analysis applies if the comment is indirect, which is not applicable here.

A.   It is.

Q.   Do you have it with you today?

A.   Yes.

Q.   Can you read in the record the rights you advised John Whitaker of that day.

A.   The rights that I read to him is, you have the right to remain silent. Anything you say can be used against you in a court of law. You have the right at this time to talk to a lawyer and to have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish. You can decide at any time to exercise these rights, not answer any questions, or make any statements.

Q.   *Did John Whitaker waive those rights and speak with you that day?*

A.   *No.*

Q.   So at some point in time did you have a conversation with him that day?

A.   Brief one, yes.

RP at 2478-79 (emphasis added). Defense counsel objected, the trial court struck the answer, and defense counsel then moved for a mistrial. The prosecutor explained that he elicited the testimony by mistake and that he intended to elicit testimony about a statement Whitaker made to Detective Pince at a different time. The trial court reserved ruling on the motion for a mistrial and the testimony continued.[4] Detective Pince then testified that Whitaker told him

---

[4] In its cross appeal, the State argues that Whitaker waived his right to assert this issue because he later asked the trial court to reserve ruling on his motion for a mistrial until after the jury rendered its verdict. We choose to reach the merits of Whitaker's claim and do not address the State's argument of waiver.

he made a statement to the FBI and that he was frustrated that Anderson "wasn't stepping up and taking responsibility for this, and that he believed [Anderson] was the one that was responsible." Id. at 2483. The State did not mention Whitaker's assertion of his right to remain silent again.

Whitaker raised this issue in his motion for a new trial. The trial court found that Detective Pince's testimony violated Whitaker's constitutional rights, but that the prosecutor did not purposefully elicit the testimony and that the error was harmless beyond a reasonable doubt:

> Taking the record as a whole, including Mr. Whitaker's express waiver of his rights during his lengthy interview with the FBI agents who arrested him in California, and the evidence of his later volunteered statements to Detective Pince, as well as the overwhelming evidence of Mr. Whitaker's involvement in the crimes charged, the court finds this testimony to be harmless beyond a reasonable doubt.

CP at 92.

The trial court correctly held that Detective Pince's response violated Whitaker's constitutional rights. The question is whether that violation was harmless beyond a reasonable doubt. We hold that, within the context of the trial, it was.

Here, jury instruction 1 instructed that if evidence "was stricken from the record, then you are not to consider it in reaching your verdict." CP at 481. Detective Pince's testimony was immediately stricken from the record by the trial court, and we presume that the jury followed the trial court's instructions and did not consider it. State v. Lamar, 180 Wn.2d 576, 586, 327 P.3d 46 (2014) ("'Juries are presumed to follow instructions absent evidence to the contrary.'")

35

(quoting State v. Dye, 178 Wn.2d 541, 556, 309 P.3d 1192 (2013)). Additionally, immediately after the improper comment, Detective Pince testified that Whitaker did talk to him, the State did not refer to the improper comment again, and as argued by the State, there was a significant amount of evidence as to Whitaker's guilt.

Whitaker argues that Detective Pince's testimony explaining the statements of other participants in the crime, provided immediately before the improper comment, unfairly juxtaposed the other participants' cooperation against Whitaker's failure to cooperate. But immediately after the improper comment, Detective Pince testified that Whitaker did talk to him. This continuation of the testimony limits any prejudicial juxtaposition. In context, the error was harmless beyond a reasonable doubt, and the trial court did not abuse its discretion by denying Whitaker's motion for a new trial.

CUMULATIVE ERROR

Whitaker argues that even if the errors raised above do not separately justify reversal, their cumulative effect does. We disagree.

The cumulative error doctrine applies when several trial errors occur which, standing alone, may not be sufficient to justify reversal but when combined may deny the defendant a fair trial. State v. Greiff, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). It does not apply where the errors are few and have little or no effect on the outcome of the trial. Id.

Here, there were several errors, including the prosecutor's invitation for the jury to imagine how Burkheimer was feeling and what she was thinking in the

hours leading up to her death, the prosecutor's closing argument about duress, and Detective Pince's comment on Whitaker's silence, none of which is reversible on its own. But even when combined, we cannot find that these errors denied Whitaker a fair trial. Therefore, reversal is not indicated.

## STATEMENT OF ADDITIONAL GROUNDS

In his statement of additional grounds, Whitaker argues that the State withheld evidence in violation of Brady v. Maryland. 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). We disagree.

To establish a Brady violation, a defendant must demonstrate that (1) the evidence at issue is favorable to the accused, (2) the evidence was willfully or inadvertently suppressed by the State, and (3) prejudice resulted. Strickler v. Greene, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999); State v. Mullen, 171 Wn.2d 881, 895, 259 P.3d 158 (2011).

Here, Whitaker argues that the State violated Brady by withholding criminal history information on the witnesses, handwritten notes from officers working the case, and information on benefits given to Christian White, a jailhouse witness. Because Whitaker fails to explain how the criminal history and handwritten notes could have aided his defense or why it was favorable to him, he cannot show a Brady violation. Additionally, because White did not testify, Whitaker cannot show that the State's failure to share impeachment information prejudiced him. Reversal is not required.

37

For the reasons stated above, we affirm.

WE CONCUR:

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON
2018 NOV -5 AM 9: 49