# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

THE STATE OF WASHINGTON,

                  Respondent,

        v.

ANNA VALERIYA KASPAROVA,

                  Defendant,

ABEL LINARES-MONTEJO,

                  Appellant.

No. 81144-4-I

DIVISION ONE

UNPUBLISHED OPINION

APPELWICK, J. — Linares appeals his conviction for first degree murder. He argues that he received ineffective assistance of counsel when his counsel failed to renew a motion to sever his trial or properly object to alleged prosecutorial misconduct. He also argues that the trial court erred by instructing the jury against jury nullification and by admitting a gruesome autopsy photo. He argues that he was denied a fair trial because the trial court declined to cover a memorial to a popular former prosecutor in the courthouse. Last, he argues the trial court failed to recognize its discretion to impose an exceptional sentence on a firearm enhancement due to Linares's youth. We affirm.

Citations and pin cites are based on the Westlaw online version of the cited material.

FACTS

On December 5, 2019, a jury found Abel Linares-Montejo and Anna Kasparova guilty of the murder of Edixon Velasquez.

Kasparova and Velasquez had been romantically involved. Velasquez ended the relationship. Kasparova and Linares[1] began dating in the spring or summer of 2017.

Kasparova and Linares planned to rob Velasquez. Kasparova set up a meeting with Velasquez by indicating she wanted to have sex with him. Velasquez then invited Kasparova to his house in West Seattle.

On the evening of September 19, 2017, Kasparova, Linares, and others went to the house. The plan was for Kasparova to lure Velasquez out of the house by asking him to parallel park her car. Accordingly, Kasparova drove her car to Velazquez's house and asked him to come out and park it for her. When Velasquez came out, she exited the car, went across the street, and stood behind another car. At that moment, Linares approached the car from behind and attempted to rob Velasquez at gunpoint. The two fought over the gun. During the struggle, two shots went off. One shot struck Velazquez in his thigh and the other in his chest. The shot to his chest severed a major blood vessel near the heart before lodging in his spine. Velasquez died at the scene.

Linares ran away. Kasparova walked past Velasquez, got into her car and drove off. Police apprehended her at her home that night.

---

[1] Linares-Montejo refers to himself as "Linares" in his briefing to this court. We follow suit.

Linares made his way to Auburn before calling Elias Guttierez for a ride. At the time, Guttierez was with three others, Juan Rodriguez, Jesus Perez Arellano, and Alondra Servin. The group picked up Linares, who told Perez and Guttierez that he had killed someone during a robbery attempt in West Seattle earlier in the evening. The next day, Linares told Servin the same thing.

Over the next few days, Linares exchanged phone calls with a close friend, Jhosselyne Caseres, who had heard of Kasparova's arrest. During the first call, Caseres asked Linares what was going on. Linares responded that he "couldn't lie" because Caseres "know[s him] too well." Both started crying, and Caseres told Linares he should turn himself in. Linares responded that he did not want to talk about the situation on the phone, but that Kasparova had "[his] back" and was "down for [him]."

During the second call, Linares told Caseres that he had intended to rob Velasquez, who had tried to grab his gun from him. Caseres again suggested that he should turn himself in. Linares became angry and said that Caseres did not know what she was talking about.

Caseres later called the Seattle Police Department tip line about the murder. Caseres agreed to allow the police to record another call with Linares. During that call, Linares said that he was "duckin'," which Caseres took to mean that he was "hiding out." She then implied that Linares had killed Velasquez because he was jealous of his previous relationship with Kasparova, which Linares denied. Linares then said he had heard derogatory facts about Velasquez. He said that "not

3

everybody . . . is fucking innocent" and "everything happens for a reason . . . I'm not trying to defend mysel- I'm not trying to defend anything. . . . God won't let nothing happen if it . . . wasn't supposed to happen."

Following this recorded call, police decided they had enough evidence to arrest Linares. Detectives took him into custody the next day, on October 4, 2017.

Police charged Linares and Kasparova with first degree murder. Their cases were joined for a single trial. Linares twice moved to sever the cases. The first motion sought severance on the belief that the State would introduce statements by Kasparova against him. The trial court denied the motion. The second motion, characterized as a renewal of the first, sought severance based on what Linares anticipated to be his and Kasparova's antagonistic defenses. The trial court denied the motion but indicated that Linares could bring the motion again at the close of the State's case. Linares did not bring the motion again.

Also before trial, Linares moved to have a memorial to a prominent former prosecutor in the courthouse covered during his trial. The memorial includes quotations attributed to the prosecutor, including "'Our Job is Not to Win Cases, but to Seek Justice.'" Linares argued the quotation was "pro-prosecutorial advertising" that violated his due process rights. The trial court denied the motion.

The case proceeded to voir dire, where the court had the following exchanges with potential jurors,

> The court will instruct you on the law of the case. Is there anyone that cannot assure the parties and the Court that you will follow these instructions regardless of what you believe the law ought to be or is?

4

[jurors raise hands]

. . . .

THE COURT:  Thank you . . . number 40.

JUROR NUMBER 40:  I'm simply aware of the fact that a juror can choose to deal with their bias.

THE COURT:  Jury nullification is not allowed in Washington.

JUROR NUMBER 40:  Oh, okay.

Defense did not object.  Sometime later, the following discussion occurred:

Q. Juror number 98, I wanted to follow up on something you said.  I think it was during Mr. Shaw's rounds.  I don't know if you need a microphone.  I think you probably do.

A. I'm kind of loud.

Q. Okay.  You had indicated that — I think you said it's hard to stay neutral?

A. Yes.

Q. It's based on — you work at the federal public defenders.  Is that right?

A. Uh-huh.

Q. What do you mean by that, that it's hard to stay neutral?

A. Well, kind of like I favor more the defender side, so — and taking into consideration the case and that — please don't take me wrong . . .

. . . .

. . . They take into consideration that they are kids and they have, like, [their] entire life in front of them, that they haven't had too much experience, and so it would be hard for me to make — to make a decision not in favor of defendants.

BY MR. YIP:

5

Q. It might be a hard decision for a lot of folks, but the question really for you is, can you be fair? Do I have a fair shot with you as a juror in this case? Will you follow the law the judge gives you?

A. Well, but the — as you know, they're always not straight. There's always you can see what is — you can interpret law in different ways.

THE COURT: Ma'am, I need to explain something to you just so we're all understanding.

The federal law is different than the state law in terms of how it is analyzed and what the options are. So the law that I give you would be the state law, and that's what you would have to follow. So I just want to clarify that for you. Okay?

Defense did not object.

At trial, the State introduced, inter alia, security video of the shooting and testimony from Servin, Perez, and Caseres that Linares confessed to the murder to them in the aftermath of the shooting. It also introduced, over defense objection, an autopsy photo of Velasquez's empty chest cavity, showing the bullet that had become lodged in his spine.

The State also introduced a Facebook message conversation between Kasparova and a friend. Defense objected to the introduction of portions of the conversation. The conversation includes a discussion of "'[m]oney team green"— a group or individual that Kasparova says robbed Linares. Kasparova expresses a desire to find money team green, asks her friend to make contact by asking if they have "fire," and asking her friend to post on her story "who has fire." Linares was concerned that the word "fire" could refer to prior bad acts or guns. The trial court allowed the conversation to be admitted, but redacted references to "fire."

During closing, the prosecutor referenced the redacted portion of the conversation:

> Also, I didn't bring [this] up in my original closing, but you'll have those Facebook messages with you, is during the same string, just prior, just prior to Edixon messaging Kasparova and saying hey, I heard you got fired, Kasparova's having a discussion with [Habibti] Maryooma about this team money green. Do you remember that and what is she saying?
> She said: Hey, you guys know this — you know this money team green? Hit em' up. Ask them if they have fire.

Linares successfully objected and the court struck the comment. Also in closing, the prosecutor made an argument about the how the law and the verdict would "make sense,"

> The law isn't some mystic thing. All right? It's supposed to represent us as a society, our shared beliefs, our shared understanding, our shared morals. The law is a codification of that. And that's what you have before you in the form of those jury instructions.
> At first blush, they might seem complicated, wordy, maybe sometimes confusing. But if you take the time to read it and think about it, you'll see that it makes sense. That's because the law is rooted in our shared common intellectual sense, and it's rooted in our shared common moral sense.
> Our shared common intellectual sense and our shared common moral sense. What that means is if you apply the law to the evidence in this case and if you follow the law, you'll reach the correct verdict. And doing so will make good common sense.

Linares did not object to the argument or request a curative instruction.

The jury found Linares guilty as charged. It also found that Linares was armed with a firearm when he committed the crime.

At sentencing, Linares, who was 19 at the time of the murder, requested an exceptional sentence downward on account of his relative youth. He asked the court not to impose the firearm enhancement. The trial court imposed a low end

7

standard range sentence. The court imposed the firearm enhancement as well, indicating that it did not have discretion to waive or reduce that part of his sentence. Linares appeals.

## DISCUSSION

Linares assigns multiple errors. He argues his counsel was ineffective for failing to renew his motion to sever his and Kasparova's trials. Next, he argues the trial court erred when it instructed potential jurors that jury nullification is not allowed in Washington. He argues the trial court erred in denying his motion to cover the memorial in the courthouse, which he claims contained pro-prosecution advertising. He argues that the trial court erred in allowing an unnecessary autopsy photo of the victim. He also argues the prosecutor committed misconduct by referring to redacted portions of evidence and arguing in closing about how the law and verdict would make sense. And, he argues his counsel was ineffective for failing to move for a mistrial for the misconduct. He argues that cumulative error deprived him of a fair trial. Last, he argues the trial court failed to recognize its discretion to waive or reduce the firearm enhancement to his sentence.

### I. Motion to Sever

Linares argues his counsel was deficient for failing to renew his motion to sever his and Kasparova's trials. Prior to trial, Linares sought severance based on what he anticipated would be his and Kasparova's antagonistic defenses. The trial court denied the motion but indicated that Linares could bring the motion again at the close of the State's case, depending on what evidence the State chose to

8

introduce. Counsel did not bring the motion again. Linares now argues that decision was ineffective assistance of counsel.

In order to show ineffective assistance of counsel, Linares must show (1) that his counsel's performance fell below an objective standard of reasonableness, and (2) he was prejudiced by the performance. State v. Estes, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). Prejudice exists if there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different. Id. In the context of a motion to sever, this means Linares must show that a competent attorney would have moved for severance, and there was a reasonable probability not just that the motion would have been granted, but also that he would have been acquitted at a separate trial. See State v. Emery, 174 Wn.2d 741, 755, 278 P.3d 653 (2012).

Linares cannot meet that burden here. Even assuming, based on the trial court's invitation to renew the motion, that the trial court would have granted a motion for severance, we see no reason to believe that Linares would have been acquitted at a separate trial. Linares argues that he was prejudiced because both Kasparova and the State implicated him in the murder. And, he points to what he perceives as weaknesses in the evidence. But, the jury convicted Linares based on the evidence that was presented. Most notably, this evidence included Linares's confessions to three different people in the aftermath of the shooting and his own incriminating statements on a call recorded by the police. Linares does not argue that any of this evidence would not have been introduced at a separate

9

trial. There is no reasonable probability that a jury, presented with the same evidence of Linares's guilt, would not deliver the same result.

Linares's ineffective assistance of counsel claim based on the motion to sever fails.

## II. Jury Nullification

Linares argues the trial court erred in instructing potential jurors that jury nullification is not allowed in Washington. He did not object to the trial court's comments below. He asks us to review the error under RAP 2.5(a)(3) as a manifest error affecting a constitutional right.

Jury nullification occurs when a jury acquits a defendant, even though members of the jury believe the defendant to be guilty of the charges. State v. Nicholas, 185 Wn. App. 298, 301, 341 P.3d 1013 (2014). It is a juror's knowing and deliberate rejection of the evidence or refusal to apply the law because the result dictated by the law is contrary to the juror's sense of justice, morality, or fairness. Id. While we accept that jury nullification occurs, we have never promoted the practice. Id. at 307.

There is no constitutional right to jury nullification. Id. at 303. Linares nevertheless argues that a manifest error affecting a constitutional right exists here because the court's comments affected his right to have the jury decide his guilt or innocence. He does not explain the effect other than to say that the trial court's comment "denied Linares an opportunity for acquittal available to every other

criminal defendant in Washington." In other words, the effect was to deprive Linares or his "right" to jury nullification. But, no such right exists.

Because Linares does not articulate a manifest error that affects a constitutional right, he is not entitled to raise the issue for the first time on appeal. RAP 2.5(a)(3).

III. Motion to Cover Memorial

Linares argues the trial court erred in denying his motion to cover a memorial to a former prosecutor located in the courthouse where his case was tried. He specifically objects to a quotation on the memorial that reads, "Our Job is Not to Win Cases, but to Seek Justice." He argues the memorial is "pro-prosecutorial advertising." He argues the jury's potential exposure to the memorial affected his right to a fair trial and constituted exposure to extrinsic evidence.

We review the trial court's determination that particular circumstances do not violate a defendant's due process rights for abuse of discretion. State v. Lord, 161 Wn.2d 276, 283, 165 P.3d 1251 (2007). A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons. Id. at 283-84.

Here, the trial court considered Linares's argument that the memorial constituted pro-prosecutorial advertising. But, it concluded that the language on the memorial "could cut both directions," because jurors could interpret the statement as saying the prosecution does not want to secure a guilty verdict if such a verdict would be unjust. That interpretation is not manifestly unreasonable and

11

not an abuse of the trial court's discretion. Even if jurors were to interpret the quotation to mean that prosecutors believe a guilty verdict would be the just result, prosecutors are not prohibited from making that argument in closing. See State v. Fuller, 169 Wn. App. 797, 822-83, 282 P.2d 126 (2012).

Nor should the memorial be considered "extrinsic evidence" that necessitates a new trial. "Relevant evidence" is that which makes a fact of consequence any more or less probable. ER 401. The memorial here is not relevant to any consequential fact in this case. The quotation, attributed to a former prosecutor, is relevant only to that prosecutor's opinion on the nature of prosecution. It has no bearing on the facts of this case and is not necessarily relevant to the opinion of the prosecutors who made the decision to bring it.

We agree with the trial court that the memorial does not constitute pro-prosecutorial advertising and is not extrinsic evidence in this case.

IV. Autopsy Photo

Linares claims the trial court erred in admitting, over Linares's objection, an autopsy photograph of the inside of Velasquez's ribcage showing where a bullet had lodged in his spine. He argues the photograph was gruesome and duplicative of other photos admitted into evidence, such that its probative value was outweighed by the danger of unfair prejudice.

A trial court may exclude relevant evidence if its probative value is substantially outweighed by the risk of unfair prejudice. ER 403. Autopsy photographs have probative value where they are used to illustrate or explain the

testimony of the pathologist who performed the autopsy. State v. Whitaker, 6 Wn. App. 2d 1, 36, 429 P.3d 512 (2018), aff'd, 195 Wn.2d 333, 459 P.3d 1074 (2020). It is reasonable to conclude that a jury would better understand the doctor's testimony with photographs rather than diagrams. Id. at 37. We review a trial court's decision to admit autopsy photographs for an abuse of discretion. Id. at 36. We will uphold the trial court's decision unless it is clear from the record that the primary reason to admit the photograph was to inflame the jury's passion. Id.

Nothing in the record indicates that inflaming the jury's passion was the primary purpose here. Rather, the purpose was to assist the testimony of the pathologist regarding the path of the bullet recovered from Velasquez's spine. Linares instead argues that the path of the bullet could just as easily be shown from a photograph of an x-ray of the bullet's location. But, the State is not precluded from utilizing photographic evidence because less inflammatory evidence is available. See id. at 37 (admitted photographs rather than diagrams); State v. Stackhouse, 90 Wn. App. 344, 356, 957 P.2d 218 (1998) (admitted taped confession in addition to detectives' testimony).

The trial court did not abuse its discretion in admitting the autopsy photograph.

V. Prosecutorial Misconduct

Linares alleges two instances of prosecutorial misconduct during the State's closing arguments. The first instance involves the prosecutor revealing redacted portions of a Facebook message conversation to the jury. Defense successfully

13

objected and the trial court struck the comment. Linares nevertheless argues that the misconduct denied him a fair trial and that his counsel was ineffective for failing to request a mistrial. The second instance involves the prosecutor describing the law as being rooted, inter alia, in "'our shared moral sense,'" and encouraging jurors to reach a verdict that makes "'good common sense.'" Linares did not object to the argument below, a decision that he now argues his counsel was ineffective. And, he argues the misconduct was so flagrant and ill-intentioned that it warrants a new trial.

A. Reference to Redacted Evidence

At trial, the State introduced a Facebook conversation between Kasparova and a friend of hers named Maryooma. In it, she discussed "money team green," a group or individual whom she claims robbed Linares. She asked Maryooma to post on money team green's story and reach out to money team green on Snapchat to see if they have "fire" in an apparent attempt to make contact with them. Defense successfully objected to the inclusion of these messages. But, the prosecutor referred to those messages in closing argument. Linares again successfully objected and the trial court struck the comment.

We agree with Linares that it was misconduct for the prosecutor to refer to the excluded evidence during closing. The question is whether that misconduct necessitates a new trial. Prosecutorial misconduct requires a new trial if there is a substantial likelihood that the misconduct affected the jury's verdict. State v. Copeland, 130 Wn.2d 244, 284, 922 P.2d 1304 (1996).

14

The prosecutor's comment did not affect the jury's verdict here. The jury was instructed to "disregard any remark, statement, or argument that is not supported by the evidence." The prosecutor's comment that Kasparova asked her friend about "fire" in the Facebook conversation was not supported by the evidence because that portion was redacted. Linares argues that "some arguments cannot be cured with an instruction." He argues that jurors would be able to figure out that the statements referred to by the prosecutor was the redacted portion of the conversation they received.

The jury is presumed to have followed the court's instructions. State v. Swan, 114 Wn.2d 613, 661-62, 790 P.2d 610 (1990). We presume the jury properly disregarded the comment. Linares points to nothing in the record that persuades us the presumption is inapplicable to the facts here. Nor does he demonstrate that the jury did not disregard the comment as instructed.

To succeed on this ineffective assistance claim, Linares must show a reasonable probability that the trial court would have granted his motion. Estes, 188 Wn.2d at 458 (ineffective assistance claim succeeds if there is a substantial likelihood that the outcome of the proceedings would have been different). The trial court will grant a mistrial only where the defendant has been so prejudiced that nothing short of a new trial can ensure a fair trial. State v. Russell, 125 Wn.2d 24, 85, 882 P.2d 747 (1994). That level of prejudice does not exist here. Counsel was not ineffective for failing to move for a mistrial because the motion would have been denied.

15

B. <u>Good Moral Sense</u>

Linares also argues the prosecutor committed misconduct by making the following argument:

> The law isn't some mystic thing. All right? It's supposed to represent us as a society, our shared beliefs, our shared understanding, our shared morals. The law is a codification of that. And that's what you have before you in the form of those jury instructions.
>
> At first blush, they might seem complicated, wordy, maybe sometimes confusing. But if you take the time to read it and think about it, you'll see that it makes sense. That's because the law is rooted in our shared common intellectual sense, and it's rooted in our shared common moral sense.
>
> Our shared common intellectual sense and our shared common moral sense. What that means is if you apply the law to the evidence in this case and if you follow the law, you'll reach the correct verdict. And doing so will make good common sense.

He argues this, combined with other references encouraging the jury to use its "common sense," encouraged the jury to convict based on reasons other than the evidence. We disagree. Jurors are expected to use their common sense when reaching a verdict. <u>State v. Balisok</u>, 123 Wn.2d 114, 119, 866 P.2d 631 (1994). It is not misconduct to encourage them to do so. Aside from the references to "common sense," we are left with the unremarkable statement that the law is based in part on our "common moral sense." That statement did not encourage the jurors to convict based on reasons other than the evidence. We find no misconduct in the prosecutor's statements. A new trial was not warranted, and it was not ineffective assistance of counsel not to object because any objection would have been overruled.

16

VI. Sentencing

Linares was 19 years old at the time he committed the crime. He argues that the trial court erred in not recognizing that it had discretion to impose an exceptional sentence downward for his firearm enhancement sentence on account of his youth.

In State v. Brown, our Supreme Court held that deadly weapons enhancements are mandatory. 139 Wn.2d 20, 29, 983 P.2d 608 (1999). The Supreme Court overruled Brown as it relates to juvenile offenders in Houston-Sconiers. State v. Houston-Sconiers, 188 Wn.2d 1, 21, 391 P.3d 409 (2017); see also State v. Mandefero, 14 Wn. App. 2d 825, 831-32, 473 P.3d 1239 (2020). But, Brown remains good law as it relates to defendants who, like Linares, were not juveniles at the time they committed their crimes. Id.

Linares argues this rule must be reexamined in light of In re Pers. Restraint of Monschke, 197 Wn.2d 305, 482 P.3d 276 (2021). There, our Supreme Court ruled that sentencing courts must consider the mitigating qualities of youth before imposing a mandatory life without parole sentence on defendants younger than 21. Id. at 329. This case does not address mandatory life without parole. And, Monschke does not address firearm enhancements or overrule Brown.

Trial courts do not have discretion to impose an exceptional sentence downward for a firearm enhancement when the offender is not a juvenile at the time they commit the crime. Mandefero, 14 Wn. App. 2d at 828. The trial court did not abuse its discretion by recognizing that fact.

17

VII. <u>Conclusion</u>

The trial court did not err and Linares did not receive ineffective assistance of counsel. While the prosecutor committed misconduct by referring to facts not in evidence, this error did not substantially affect the jury's verdict. The prosecutor committed no other misconduct.[2]

We affirm.

*Appelwick, J.*

WE CONCUR:

*Coburn, J.*          *Andrus, A.C.J.*

---

[2] Because we find that only one error occurred, Linares's claim of cumulative error also fails. The cumulative error doctrine applies when multiple errors deprive the defendant of a fair trial. <u>State v. Coe</u>, 101 Wn.2d 772, 789, 684 P.2d 668 (1984). It is inapplicable here.